# Wytheville

## Pierce Oil Corporation, et al., v. John C. Voran, et al.

### June 14, 1923.

1. Stockholders—*Preferred Stockholders—Voting Power of Preferred Stock-holders—Default in Payment of Preferred Dividends—Case at Bar.*—The provisions of the charter of a corporation conferred upon the preferred stockholders exclusive power and right to elect directors after there should have been default in the payment of four quarterly dividends on the preferred stock. After four defaults in payment of the preferred dividends, certain of the preferred stockholders made a request in writing to the secretary of the corporation for a meeting of the preferred stockholders to elect directors, to which no response was made. The last default occurred on October 1, 1922, and on October 2, at an adjourned meeting of the common stockholders, directors were chosen. Thereafter petitioners in the instant case petitioned the lower court under sections 3803, 3804 of the Code of 1919, setting forth the above facts, and praying that the election of directors by the common stockholders be declared null and void, and that the court order an election to be held by the preferred stockholders. These prayers the lower court granted.

   *Held:* That if four quarterly dividends on the preferred stock were in default when the petition was filed and the order complained of entered, the case was rightly decided, and this regardless of whether the election by the common stockholders on October 2 was valid or not.

2. Stock and Stockholders—*Preferred Stockholders—Voting Power of Pre-ferred Stockholders—Default in Payment of Preferred Dividends—Default Occasioned by Fraud or Conspiracy of Preferred Stockholders—Case at Bar.*—The charter of a corporation conferred upon the preferred stockholders the entire and exclusive voting power in the election of directors upon four defaults in the payment of the preferred divi-dends. In the instant case, a statutory proceeding under sections 3803, 3804 of the Code of 1919, it was not denied that four quarterly dividends were in fact unpaid, but it was contended that there was no such default as to entitle the preferred stockholders to assume the

voting power because there was a conspiracy on the part of some of the preferred stockholders and others to force defaults in the preferred dividends.

*Held:* That while such fraud and conspiracy, if established, would be a defense to a demand on the part of the preferred stockholders to have the court order an election of directors by them, yet in the instant case the evidence failed to establish such fraud and conspiracy.

3. STOCK AND STOCKHOLDERS—*Election of Directors—Complaint of Election by Stockholders—Proceeding under Sections 3803, 3804 of the Code of 1919—Discretion of Court.*—A proceeding by aggrieved stockholders under sections 3803, 3804 of the Code of 1919, is a statutory proceeding intended to afford more speedy relief than could often be obtained in an ordinary suit in equity or by a writ of *quo warranto.* Trial judges are given a free hand to enable them to "make such order or give such relief in the premises as right and justice may require." In the exercise of the power thus conferred, the trial judges must be allowed wide discretion for they are expressly required to "proceed in a summary way." They may and ought to be governed by equitable principles and should deal with cases arising under the statute in accordance with substantial right and justice, but they must not be bound down to any hard and fast legal or equitable rules.

4. STOCK AND STOCKHOLDERS—*Election of Directors—Complaint of Election by Stockholders—Proceeding under Sections 3803, 3804 of the Code of 1919—Range of Evidence.*—In proceeding under sections 3803, 3804 of the Code of 1919 by preferred stockholders, asserting their rights on default of preferred dividends to elect the directors of the corporation, where the corporation alleged that the default in the preferred dividends was caused by fraud and conspiracy on the part of some of the preferred stockholders and others, the range of the evidence admissible to prove such fraud and conspiracy was necessarily to a large extent a matter to be regulated by the sound discretion of the judge, and in the instant case there was no abuse of that discretion.

5. FRAUD AND CONSPIRACY—*Rules of Evidence as to Proof of Fraud and Conspiracy—Circumstantial Evidence.*—The general rules of evidence as to proof of fraud and conspiracy are well understood. Direct proof is seldom obtainable. But circumstantial evidence, when solely relied upon, must be clear and convincing, and not merely such as to raise a suspicion.

6. STOCK AND STOCKHOLDERS—*Preferred Stockholders—Voting Power of Preferred Stockholders—Default in Payment of Preferred Dividends—Default Occasioned by Fraud or Conspiracy of Preferred Stockholders—Case at Bar.*—In the instant case, a proceeding under sections 3803, 3804 of the Code of 1919, the preferred stockholders of a corporation asserted that they were entitled to elect the directors of the corporation

14

because of default in the preferred dividends. The corporation alleged that such default was due to a conspiracy of certain of the preferred stockholders and others to financially embarass the corporation and force such default. The lower court limited the appellants as to the evidence of fraud and conspiracy to the period between September, 1921, and October, 1922, with the proviso, however, that if the investigation showed any fraud or conspiracy, the court would inquire further back.

*Held:* That while it would have been an arbitrary exercise of discretion if the judge had unqualifiedly refused to permit the appellants to go back of September, 1921, with their evidence, and even with the proviso of the court its ruling was not sufficiently liberal to the appellants, yet in the practical result they were not unduly restricted, as the evidence actually introduced on both sides disclosed that there was no conspiracy as appellants alleged.

7. STOCK AND STOCKHOLDERS—*Preferred Stockholders—Default in Preferred Dividends—When Default Occurs—Surplus of Corporation—Case at Bar.*—The charter of a corporation provided that when four quarterly dividends on the preferred stock were in default the voting power in the election of directors should pass to the preferrred stockholders. In the instant case, although it was nor denied that four quarterly dividends were in fact unpaid, appellants alleged that the corporation had ample surplus out of which the dividends could have been paid, and therefore there was no default within the meaning of the charter.

*Held:* That whether the corporation had a surplus out of which the dividends could be paid was immaterial, as the directors acting in good faith passed the dividends.

8. STOCK AND STOCKHOLDERS—*Election of Directors—Contest Between Preferred and Common Stockholders—Case at Bar.*—The provisions of the charter of a corporation conferred upon the preferred stockholders exclusive right and power to elect directors after there should have been default in the payment of four quarterly dividends on the preferred stock. After four defaults in payment of the preferred dividends, certain of the preferred stockholders made a request in writing to the secretary of the corporation for a meeting of the preferred stockholders to elect directors, to which no response was made. The last default occurred on October 1, 1922, and on October 2, at an adjourned meeting of the common stockholders, directors were chosen.

*Held:* That the election of directors by the common stockholders was invalid as all voting power for the election of directors had passed to the preferred stockholders.

9. STOCK AND STOCKHOLDERS—*Preferred Stockholders—Default in Payment of Preferred Dividends—Voting Power of Preferred Stockholders—De-*

*fault Alleged to be Due to Litigation—Case at Bar.*—In the instant case the voting power in the election of directors was to pass to the preferred stockholders upon four defaults in the preferred dividends. On October 2, 1922, the date upon which the fourth preferred dividend should have been declared to avoid a default, the old board of directors, having failed to vote for the payment of the preferred dividend, adjourned, and the new board elected on that day did not attempt to declare a preferred dividend, although there was ample time for them to meet and act before the instant proceeding was instituted.

*Held:*    That the fourth default was complete after October 2, 1922.

10.  STOCK AND STOCKHOLDERS—*Preferred Dividends— Proceeding under Sections 3803, 3804 of the Code of 1919—Court Ordering Past Due Preferred Dividends in Default to be Paid—Relief Against Forfeiture—Case at Bar.*—The voting power in the election of directors of a corporation was to pass to the preferred stockholders upon default in payment of four quarterly dividends upon the preferred stock.    In the instant case, a proceeding by stockholders under sections 3803, 3804 of the Code of 1919, asking that the court order an election of directors by the preferred stockholders, appellants contended that the court erred in refusing to authorize the directors elected by the common stockholders after the default to pay the past due preferred dividends, and thus relieve a forfeiture by which the voting power passed to the preferred stockholders.

*Held:*    That this relief was properly denied.    If the action of the directors in passing the dividends had been due to fraud or conspiracy, the principles applicable to a relief against forfeiture would have applied. But no fraud or conspiracy was shown, and the directors must be regarded as having acted in good faith.

11.  PENALTIES AND FORFEITURES—*Relief Against Forfeitures—Limits to the Doctrine.*—Courts do not go far enough in relieving against forfeitures to amend charters of incorporation or disregard plain contracts.

12.  STOCK AND STOCKHOLDERS—*Default in Preferred Dividends—Estoppel— Inconsistent Positions in Suit—Case at Bar.*—A party is forbidden to assume successive positions in the course of a suit or series of suits in reference to the same fact or state of facts which are inconsistent with each other and mutually contradictory.    But in the instant case, which turned upon the default of a corporation in paying preferred dividends, appellants were not precluded from claiming, first, that the corporation had abundant assets out of which the preferred dividends would have been paid but for the litigation, and in the alternative from contending that if appellees were right in the averment that there was no surplus, then upon appellees' own showing, there was no default in payment of the preferred dividends, because, if there was no surplus, no preferred dividends were due.

13. STOCKS AND STOCKHOLDERS—*Preferred Stockholders—When Default in Payment of Preferred Dividends Occurs—Where there was No Surplus —Case at Bar.*—In the instant case, upon default in payment of preferred dividends, the voting power in the election of directors was to pass from the common stockholders to the preferred stockholders. It was contended by appellants that if the corporation had no surplus from which the preferred dividends could be paid, there were no dividends payable, and hence no default. It was conceded that the directors had no right to pay dividends except out of the surplus or net profits.

   *Held:* That there was no merit in this contention, and that upon failure to pay four quarterly dividends from any cause whatsoever, the voting power passed to the preferred stockholders.

14. STOCKS AND STOCKHOLDERS—*Meeting—Notice to Preferred and Common Stockholders—Case at Bar.*—In the instant case, a proceeding under 3804 of the Code of 1919 by stockholders asking the court to order an election of directors by the preferred stockholders upon default in the payment of preferred dividends, the order of the court directing such meeting did not require any notice to be given to the common stockholders, although there was a provision that the notice of the meeting should be "similar to that provided in the by-laws for an annual meeting."

   *Held:* No error.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for petitioners. Respondents appeal.

*Affirmed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson,* and *Alton B. Parker,* for the appellants.

*McGuire, Riely & Eggleston,* and *Samuel Untermyer,* for the appellees.

KELLY, P., delivered the opinion of the court.

The Pierce Oil Corporation was incorporated in 1913 under the laws of Virginia, taking over, under an en-

larged plan, the properties of a Missouri corporation
known as the Waters-Pierce Oil Company.   Mr. Henry
Clay Pierce, of St. Louis, has been the active head and
controlling spirit in both companies.   The principal of-
fice of the Pierce Oil Corporation, in legal contempla-
tion, is in the city of Richmond, but most of its prop-
erties are outside of Virginia, and its chief business of-
fices are in New York city.   At this time the corpora-
tion has an outstanding issue of $30,000,000.00, par
value, of preferred stock, and about twice that amount
of common stock.

The preferred stock was authorized and issued under
an amendment to the charter of the corporation pro-
cured in the summer of 1919.   The immediate purpose
of this issue was to secure money with which to retire
certain debenture notes, bearing six per cent. interest
and maturing within a few years, for something over
eleven million dollars, and the preferred stock was sub-
scribed for and taken under a general plan which the di-
rectors of the corporation regarded as best and most
available for the further financing of its business.   This
plan was initiated and carried through under the advice
and management of Mr. Samuel Untermyer, who in
1919 had become general counsel for the corporation.
Mr. Pierce was entirely familiar with the negotiations
and operations of Mr. Untermyer in this respect, and
was in thorough accord with the plan.   In a statement
sent out to the stockholders under date of July, 1919,
signed "H. C. Pierce, President," the arrangement was
set out somewhat in detail, and among other things this
was said: "It has accordingly been determined by the
board of directors of the corporation that any further
financing can best be effected by retirement of the de-
bentures and notes and the creation and sale of $15,000,
000.00 of preferred stock   *   *.   The board of direc-

tors has approved the proposed plan and recommends its adoption by the stockholders."

Clause (b) of section A of the charter, as amended, contains the following provision:

"The holders of the eight per cent. cumulative convertible preferred stock shall be entitled to receive and the corporation shall be obligated to pay, but only out of the surplus or net profits of the corporation, cumulative dividends at the rate of eight per cent. per annum and no more, payable quarterly-yearly on the first days of January, April, July and October in each year."

In clause (1) of the same section of the charter it is provided as follows:

"The entire voting power for the election of directors shall be vested in the common stock except as herein otherwise provided. The eight per cent. cumulative convertible preferred stock shall have no voting power in the election for directors unless and until four quarterly dividends payable thereon shall be in default. Immediately upon the happening of such event, and thereafter until such defaults and all defaults subsequent thereto shall have been made good (and the same shall be made good as soon as reasonably practicable), the common stock shall have no voting power in the election of directors and the entire voting power in the election for directors shall become and remain vested exclusively in the preferred stock.   *   *   The terms of office of all persons who may be directors of the company at the time when the exclusive voting power of the preferred stock shall accrue as herein provided shall terminate upon the election of their successors at a meeting of the preferred stockholders. Such meeting shall be held at any time after the accrual of such exclusive voting power in the preferred stock upon notice similar to that provided in the by-laws for an annual meeting

at the request, in writing, of any holder of the preferred stock addressed to the secretary of the company at its principal business office.    Upon the termination of the exclusive voting power of the preferred stock at any time by reason of the payment of all accumulated and defaulted dividends on such stock, the terms of office of all persons who may have been elected directors of the corporation by vote of the preferred stockholders shall terminate upon the election of their successors at a meeting of the holders of the common stock.    Such meeting shall be held at any time after the termination of such exclusive voting power upon notice similar to that provided by the by-laws for an annual meeting at the request, in writing, of any holder of the common stock addressed to the secretary of the company at its principal business office.''

Prior to October 1, 1922, three quarterly dividends on the preferred stock had been passed and remained unpaid, and on that date a fourth default occurred.

On October 4th and 5th, respectively, certain of the preferred stockholders, being some of the same persons who are the petitioners in this proceeding and named below, made request, in writing, to the secretary of the corporation for a meeting of the preferred stockholders to elect directors; and a similar request, in writing, was made to the secretary, president and chairman of the board, respectively, on October 9, 1922.    No response was made to either of these requests.

On October 13, 1922, pursuant to notice previously given, John G. Voran, holder of 150 shares of the common stock, and Alvin Untermyer and four others, holding an aggregate of 8,204 shares of the preferred stock, filed their petition in the Chancery Court of the city of Richmond, setting forth among other things that the corporation had defaulted in the payment of four quar-

terly dividends on the preferred stock; that the voting power for the election of directors had thereupon passed by the terms of the charter to the preferred stockholders; that on October 2, 1922, at a meeting of the common stockholders held that day by adjournment from time to time of the annual meeting in April, 1922, certain persons were elected as directors, and that such election was wrongful and unlawful. The substance of the prayer of the petition was that the said election of directors, held on October 2nd, be declared null and void, and that the court order an election to be held by the preferred stockholders for the election of a board of directors.

The parties defendant to this petition were Pierce Oil Corporation, and the newly chosen directors, whose election was sought to be annulled, to-wit: Henry W. Anderson, Henry L. Dougherty, Warren W. Foster, A. B. Leach, Alton B. Parker, Clay Arthur Pierce, Henry Clay Pierce, Henry S. Priest, Eben Richards, E. W. Hollins, and Charles S. Thomas. Notice of the petition was served on Mr. Anderson, and on the corporation through its statutory agent. The other defendants were non-residents, and none of them appeared except Mr. Henry Clay Pierce, who entered a formal appearance during the hearing in the lower court.

. The corporation answered at great length, resisting the prayer of the petition, and Mr. Anderson adopted the answer of the corporation. There was a very full hearing before the judge of the chancery court, at which the evidence was heard *ore tenus*, and on December 1, 1922, a final order was entered setting aside the election held on October 2nd, enjoining the persons named at that meeting as directors from exercising any authority as such, and ordering a meeting of the preferred stockholders to be called and held, as particularly specified in

the order, for the purpose of electing a board of directors. From that order the Pierce Oil Company and H. C. Pierce, two of the defendants to the said petition, applied for and obtained this appeal.

The petition by which this proceeding was instituted purported to be filed pursuant to the provisions of sections 3803 and 3804 of the Code of 1919. The latter section controls the case, and is as follows:

"Any stockholders who may be aggrieved by, or complain of, any election for directors, or of any proceeding, act, or matter touching the same, may, after giving reasonable notice to the corporation and to any person who is to be affected thereby, otherwise than as a stockholder only, make application by petition to the judge of the circuit court of the county, or of the circuit, corporation, or chancery court of the city wherein the principal office in this State of such corporation is located, in term time or vacation, and the said judge shall proceed forthwith, and in a summary way, to hear the allegations and proofs introduced by the parties, or otherwise inquire into the matter; or causes of complaint, and thereupon establish the election so complained of, or order a new election, or make such order and give such relief in the premises as right and justice may require. Pending the hearing and determination of an application to investigate an election of directors, the judge may, by order, restrain the persons claiming to have been elected directors from exercising any of the functions or duties of the office."

[1] The record and briefs in this case cover more than two thousand printed pages. The arguments of counsel have taken a very wide range, and many questions have been discussed which, in our opinion, need not be decided. The provisions of the charter clearly operate to confer upon the preferred stockholders the exclusive

right and power to elect directors after there shall have been default in the payment of four quarterly dividends on the preferred stock. This right and power was deliberately given them, by the organic law of the corporation, and as a matter of contract, for the security and protection of their interests, and was to become and remain vested in them "immediately upon the happening of such event and thereafter until said defaults and all defaults subsequent thereto shall have been made good." If, therefore, in this proceeding under the statute above quoted, it can be said as a matter of "right and justice," with due regard to the true meaning and intent of the charter, that four quarterly dividends on the preferred stock were in default when the petition was filed and when the order complained of was entered, the case has been rightly decided. This is true regardless of whether the election of directors by the common stockholders on October 2, 1922, was valid or not. If four defaults occurred, the right of the preferred stockholders at once accrued to have a meeting and elect their own directors at any time thereafter upon a written request to the secretary. Such request was made and ignored after October 2nd, and before application was made to the court.

[2, 3] It is not denied that four quarterly dividends were in fact unpaid when this proceeding was instituted, but the appellants contend, upon various grounds, that there has been no such default as to entitle the preferred stockholders to the relief which they sought herein and which was granted by the lower court.

As the chief ground upon which the prayer of the petition was resisted in the lower court, it was alleged that there was a conspiracy on the part of Samuel Untermyer (one of the preferred stockholders not a party to these proceedings) and his son, Alvin Untermyer, and

certain bankers in New York, to destroy the credit of
the Pierce Oil Corporation and bring about such finan-
cial embarrassment on its part as to force defaults in the
dividends on preferred stock, and thus pass to the hold-
ers of such stock the control of the corporation.    This
contention has followed the case to this court and has
been most strenuously insisted upon before us.    It has
been urged that the evidence which the lower court
actually admitted fully sustained the charge of fraud
and conspiracy on the part of the Untermyers, acting
in concert with others; and, further, that the court
erred in limiting the evidence, as it did, to transactions
prior to the fall of 1921.    Upon a careful and patient
examination of the voluminous record before us, we are
unable to uphold either of these propositions.    The con-
troversy has developed considerable personal antag-
onisms, particularly between Mr. Pierce and the Unter-
myers, and it is evident that Mr. Samuel Untermyer is
intensely zealous in his desire to sustain the position
taken in this litigation by the preferred stockholders;
but the allegation of fraud and conspiracy is not sus-
tained, and the evidence which the court allowed to be
introduced on both sides went far enough to fully war-
rant the conclusions expressed in the written opinion of
the trial Judge, Honorable William A. Moncure, as
follows:

"    *    *    *    I have allowed evidence and heard the
complaints of the election of directors, held October 2,
1922, and any proceeding, act, or matter touching the
same.    Inasmuch as the respondent corporation com-
plained that the situation as to the election of directors,
and the failure of the corporation to pay four quarterly
dividends was brought about by fraud and conspiracy
of certain bankers in New York (holders of preferred
stock but not parties to this controversy) I have in-

quired into that beginning with certain financing of the corporation in the fall of 1921, referred to by the parties as Chase Securities Corporation Commitment; with a purpose expressed to counsel that if the investigation so made, or the testimony showed any fraud, or conspiracy, the court would inquire further back and trail any such fraud or conspiracy to its origin. It is needless to investigate further back than was done, because in my judgment there has not been shown in this investigation fraud and / or conspiracy on the part of any of the petitioners; and I may add no fraud and / or conspiracy has been proved; this being true, investigation of the corporation's transactions in the years 1919, 1920 and the early part of 1921 with any of the persons was a useless consumption of time, as all such transactions and things had been fully considered by the finance committee, or the board of directors, and whenever considered, passed upon and approved."

[3] This is a statutory proceeding intended to afford more speedy relief than could often be obtained in an ordinary suit in equity or by a writ of *quo warranto.* As we interpret the statute, trial judges are given a free hand to enable them to "make such order or give such relief in the premises as right and justice may require." In the exercise of the power thus conferred, the trial judges must be allowed wide discretion for they are expressly required to "proceed in a summary way." They may and ought to be governed by equitable principles and should deal with cases arising under the statute in accordance with substantial right and justice, but they must not be bound down to any hard and fast legal or equitable rules.

In 2 Cook on Corporations (4th ed.), section 619, it is said:

"In consequence of the delays and difficulties attend-

ing the remedy of *quo warranto*, statutes have been en-
acted in many of the States which give courts of equity
the power to review corporate elections at the instance
of the parties aggrieved. Such a statute is found in
New York, New Jersey, California, and other States.
By these statutes the court, sitting as a court of chan-
cery, is empowered to review corporate elections, and to
grant such relief as the particular circumstances and
justice of the case seem to require.

"Such a statute has proven to be one of the wisest
and best that a legislature ever enacted in regard to cor-
porations. It furnishes a speedy, simple, just and ef-
fective remedy for all complaints, and is free from use-
less technicalities and expense."

In *Stratford* v. *Mallory*, 70 N. J. Law, 294, 58 Atl.
Rep. 347, the New Jersey Court of Appeals, speaking
with respect to a statute quite similar to ours, said:

"It is manifest that the latitude allowed to the court
either to establish an election, or order a new election,
or make such order and give such relief in the premises
as right and justice may require, leaves the court free
to deal with the case not necessarily in accordance with
strict legal rules, but according to the substantial rights
and equities of the matter."

[4] The Virginia statute is limited to controversies
concerning "any election for directors, or any proceed-
ing, act or matter touching the same," and within this
limitation the judge must "proceed forthwith and in a
summary way to hear the allegations and proofs intro-
duced by the parties, or otherwise inquire into the mat-
ter," and "to give such relief in the premises as right
and justice may require." Undoubtedly fraud and
conspiracy such as is alleged in this case would consti-
tute a proper subject of inquiry, and, if established,
would be a defense to a demand on the part of the pre-

ferred stockholders to have the court order an election of directors by them; and Judge Moncure, in effect, so held. The only real difference between him and the appellants in this respect was as to the range they were allowed to take in the introduction of proof of such fraud and conspiracy. That was necessarily to a large extent a matter to be regulated by the sound discretion of the judge, and we find nothing to indicate an abuse of that discretion.

[5] The general rules of evidence as to proof of fraud and conspiracy are well understood. Direct proof is seldom obtainable. But circumstantial evidence, when solely relied upon, must be clear and convincing, and not merely such as to raise a suspicion. It is not necessary to cite authority for these settled and familiar propositions.

[6] Now in this case, in view of the allegations of the answer, it would have been an arbitrary exercise of discretion if the judge had unqualifiedly refused to permit the respondents to go back of September, 1921, with their evidence, but he did not do this. He limited them to the period between September, 1921, and October, 1922, but "with a purpose expressed to counsel that if the investigation so made or the testimony showed any fraud or conspiracy, the court would inquire further back and trail any such fraud or conspiracy to its origin." Strictly construed and applied, even this qualification of the restriction was not sufficiently liberal to the respondents, but in the practical result they were not unduly restricted. The evidence actually introduced on both sides disclosed very satisfactorily that there was no such conspiracy as respondents allege. The testimony with respect to the transactions between September, 1921, and October, 1922, affirmatively disproved such allegations, and the court was fully justi-

fied in cutting off further inquiry. It must be re-
membered in this connection that, as stated by counsel
for the appellants in their petition for this appeal, "in
the case at bar the basic transaction in the charge of
conspiracy to embarrass this corporation and obtain
control was in the circumstances surrounding the issue
of the preferred stock in 1919 upon the suggestion of
Mr. Untermyer." There is much complaint that the
court did not allow the respondents to go into many of
the circumstances with respect to the issue of this stock
in 1919; but the court was quite right in this respect.
It is perfectly obvious from the record that Mr. H. C.
Pierce, who is the author of and the chief complainant
as to these charges, approved and voted for the entire
plan, and that if, as stated, the establishment of the
conspiracy depends upon showing that the purpose of
issuing preferred stock was to obtain control of the cor-
poration by embarrassing it in its finances, the charge
must utterly fail.

What has been said is sufficient to dispose of the de-
fense based upon the theory that the failure to pay
dividends on the preferred stock was brought about by
fraud and conspiracy on the part of certain of the pre-
ferred stockholders. This brings us to a consideration
of the question whether, in the absence of such alleged
fraud and conspiracy, it can be said as a matter of
"right and justice," with due regard to the meaning and
intent of the charter, that four quarterly dividends on
the preferred stock were in default when this proceed-
ing was instituted and when the order complained of
was entered.

Upon this branch of the case two alternative posi-
tions are taken by the appellants—first, that the cor-
poration had ample surplus out of which the dividends
could and would have been paid but for this litigation,

and, second, that if, as alleged by the preferred stock-holders, there was in fact no surplus out of which the payment could be made, then there was no default because in that condition the dividends, which could only be lawfully paid out of surplus or net profits, *had not become payable.*

We shall consider these two propositions in the order here stated.

[7] Whether the corporation did or did not have on October 1, 1922, any surplus out of which the dividends could be paid is a question which we do not attempt to answer. A great deal of evidence was taken upon this point. The appellants earnestly insist that the company, on October 2, 1922, under a proper statement of its assets and liabilities, had a very large surplus, many times larger than necessary to pay not only the dividends due on that date, but all past due dividends. The appellees, on the other hand, deny this, but contend, and we think correctly, that the question is not material here. If the corporation had funds out of which the dividend could be paid, the fact remains that the directors for some reason failed to direct such payment. It is contended that the principal reason why the dividend was not paid on October 1, 1922, was because Mr. Alvin Untermyer, one of the petitioners, in furtherance of the fraud and conspiracy above referred to, exercised duress over the directors by threatening them with criminal liability and prosecution if they made the payment. It is true that Mr. Untermyer did write a letter to the directors in which he expressed the opinion that it would be unlawful and probably criminal to make the payment, but we do not think there is anything in the record to show that the directors were influenced by this statement. As a matter of fact, it was a foregone conclusion before the statement was made that a ma-

jority of the directors would vote against the payment of the dividend.  The corporation was undeniably in. great financial embarrassment throughout the period during which the four quarterly dividends were passed. We shall not assume that the directors deliberately withheld dividends when the corporation had a full treasury and when there was no satisfactory reason for· withholding them.  In such a case of course the default would be wilfully arbitrary, and the preferred stock-- holders' right to oust the old board and elect a new one would be too clear for argument.  The more probable explanation, and the true one, as we conclude from the record, is that the directors passed the dividends either· because they believed they had no surplus, or because they thought the financial exigencies of the corpora-- tion so serious as that the wise course was to withhold the payment.

On October 1, 1922, the directors of the corporation were Frederick Lewishon, H. C. Pierce, C. A. Pierce,. Eben Richards, Moritz Rosenthal, Harold B. Thorne, Alvin Untermyer and W. A. Williams.  Their regular· terms of office expired in April, 1922, when the annual meeting of the stockholders was held, but no directors were elected at that meeting and the persons named above held over subject to election of their successors.. It is contended by the appellees that this annual meet- ing was illegal for lack of proper notice.  The lower court sustained this contention.  The question here involved, however, is not material to the decision of the case as we view it, and the point need not be further· noticed.  The meeting just mentioned was adjourned from time to time and was in recess on September 21, 1922, when Mr. H. C. Pierce sent Mr. Waterbury, who was the assistant secretary and treasurer of the corpora- tion, from New York to Richmond equipped with

proxies, and with the instruction to adjourn the meeting from day to day and to await orders from Mr. Pierce. Of the situation about this time, Judge Moncure, in his written opinion above referred to, makes the following statement which appears to us to be very fully supported by the record:

"The facts seem to be that for the year 1921 the Pierce Oil Corporation's balance sheet did not show up very well. By its inventory alone it lost between four and five million dollars. The board of directors saw fit to pay no dividend on the preferred stock October 1, 1921. None was paid January 1, 1922, though in January, 1922, a declaration for payment of a quarterly dividend was made and this was paid in February, 1922. No dividend was paid April 1, 1922, none paid July 1, 1922, and none October 1, 1922. For the year 1922, up to October 1, the company had lost $800,000.00. For the purpose of raising money to keep the business at a greatly reduced capacity, the company had to rely for credit on the sale of its accounts, as well as the hypothecation of its oil in tanks, etc.

"Just at this time and in this situation of its finances, Mr. Henry Clay Pierce, the chairman of the board and owner of about 265,000 shares of common stock, became feverishly anxious to have a quarterly dividend on the preferred stock paid. The cash to do so was not on hand and the company's financial statement did not justify (in the discretion of the directors) the payment of the dividend.

"The following directors did not favor a dividend: Harold B. Thorne, Frederick Lewishon, W. A. Williams, Alvin Untermyer, Moritz Rosenthal; and as I construe the testimony of Judge Alton B. Parker, Clay Arthur Pierce and Eben Richards, son and son-in-law respectively of Henry Clay Pierce, did not think the dividend

should be paid, but did not wish the matter brought to a vote as they did not wish to go against the wish of their father, Mr. Henry Clay Pierce."

In his apparent eagerness for cash which he knew the company did not have available, Mr. Pierce entered into negotiations on or about September 29th with Mr. H. L. Doherty, who was the head of a banking firm in New York and was also interested in the oil business, and thus a competitor of the Pierce Oil Corporation. These negotiations resulted on October 2nd in a contract whereby Mr. Doherty agreed to lend $300,000.00 with which to pay the October 1st dividend. This contract has been the subject of much comment, both in the trial court and in the argument and briefs before us. We shall not enter into any analysis of the contract, nor of the motives and purposes which actuated Mr. Pierce and Mr. Doherty, except to say that we agree with the conclusion of the trial court that the purpose of the contract was, and the effect of it would have been, to put Mr. Doherty in a position to obtain full control of the corporation, at least in association with Mr. Pierce, and that the contract was not a proper one for Mr. Pierce to make at the time. In furtherance of the purposes of this agreement, Pierce and Doherty agreed upon a list of eleven names for a new board of directors, and they were elected as hereinafter shown.

In the meantime, the old board of directors, after much discussion and negotiation which need not be set out in detail, met in New York on Monday morning, October 2nd (October 1st falling on Sunday), and adjourned *sine die* without declaring a dividend. The purpose of that meeting was to consider the question of the October 1st dividend, and the directors in failing to direct payment thereof did so with knowledge of the Doherty contract and the means thereby offered to secure the necessary money.

Thereupon the election of the new board followed. As said by the trial judge: "Pierce then gave the names so agreed upon by himself and Doherty to C. W. Randall, the V. P. and secretary, who telephoned the names to Waterbury, at Richmond, and Waterbury, with the substitution of the proxies as stated, held an adjourned meeting on October 2, 1922, at five minutes past six, and elected for directors the persons so named by Doherty and Pierce."

The new board thus elected has never undertaken to direct the payment of a dividend, although the first notice of the purpose to file the petition in this cause was given on October 5th. The reason which the appellants assign for the failure to attempt to direct the payment of the dividend was that, before they could act in the matter, this litigation had been instituted, and that they were advised by counsel that they ought not to do anything that would affect the status of the controversy. This reason does not cover the interim between October 2nd and October 5th. In that interim there was no litigation pending which would have prevented the directors from making the payment.

The judge of the lower court held that the election of the new board was void on various grounds, namely: (1) Lack of notice to the preferred stockholders of the annual meeting held in April, 1922; (2) lack of authority in H. R. Waterbury to cast the votes which he did cast on October 2nd for the directors elected at that meeting; (3) the fact that at the time of the election on October 2, 1922, four quarterly installments of dividends on the preferred stock were in default, thus causing all voting power for the election of directors to pass to the preferred stockholders at once; and (4) the proposition that the election ought to be set aside on equitable grounds.

[8] As already indicated, and as hereinafter more fully shown, it is really not material whether the election in question was valid or not. But we will add, without prolonging the discussion on this point, that we concur with Judge Moncure in the view that the election was invalid, and we are of opinion that the third ground given by him for so holding is conclusive. The old board had definitely and finally failed to vote for the payment of the dividend, and had adjourned on the morning of October 2, 1922. It is conceded that at the time of the election of the new board, about 6 p. m. of the same day in Richmond, there was no possibility of any meeting of such board before midnight of that day. In other words, the default had passed beyond any possible recall at the time the common stockholders undertook to elect the new directors. Under the plain terms of the charter, therefore, they had "no voting power in the election of directors."

[9] But if it were conceded that the election of the new board on October 2, 1922, was valid, it would not follow that the order appealed from must be reversed. The new board did not attempt to declare a dividend, although there was ample time for them to meet and act before this proceeding was instituted. Instead of doing this, they, or at least some of them, set about trying to secure the approval of the preferred stockholders. In any possible view of the case, the fourth default was complete after October 2, 1922, and the court followed the plain terms of the statute in directing an election by the preferred stockholders.

[10] In this connection, we may as well dispose of the further contention of the appellants that the court erred in refusing to authorize the new directors to pay the past due dividends, and thus relieve what the appellants describe as a forfeiture by which the voting power

passed to the preferred stockholders. This request for relief against the so-called forfeiture was presented to the court in two ways—first, by answer and cross-petition in which the respondents prayed that the new board elected October 2, 1922, "be authorized to declare and provide for the prompt payment of all past due quarterly dividends upon said eight per cent. cumulative preferred stock, and that the proper officers of respondent be directed and required to give immediate notice of the calling of a special meeting of said directors and consider and take action thereon in pursuance of the orders or decrees of this honorable court;" and, second, by motion made in the cause on the — day of November, after the trial judge had announced his decision, for them to pay *one dividend* of two per cent. on the preferred stock with the same force and effect as if same had been paid on October 1, 1922.

The relief thus prayed for was properly denied.

If the action of the directors in passing four dividends had been, as alleged, due to fraud and conspiracy on the part of the petitioners, the principles applicable to a relief against forfeiture would have applied to this case. But, as we have seen, no fraud or conspiracy was shown, and the failure to pay the dividends must be regarded as having been due to the deliberate judgment and action of the directors. Whether this was because they doubted the sufficiency of the assets or the wisdom of making the payment is immaterial. The failure to pay for either reason created the situation under which, as a matter of organic corporate law and as a matter of contract, the power to elect directors passed to the preferred stockholders. The directors could not properly shift their responsibility in the matter to the court.

[11] Courts do not go far enough in relieving against forfeitures to amend charters of incorporation or disregard plain contracts. In 21 C. J., p. 101, it is said:

"The jurisdiction to relieve against forfeitures is exercised upon the principle that a party having a legal right shall not be permitted to avail himself of it for the purposes of injustice or oppression. The jurisdiction is regarded as a dangerous one, not to be extended. It does not extend so far as to authorize a court of equity to disregard and set aside the valid stipulation of the parties upon the performance of which their rights are made to depend."

Again, in 13 C. J., pp. 541-2, it is said: "It is not the province of a court, however, to change the terms of a contract which has been entered into, even though it may be a harsh and an unreasonable one. Nor will the dictates of equity be followed, if by so doing the terms of a contract are ignored, for the folly or wisdom of a contract is not for the court to pass upon. Its terms, however onerous they may be, must be enforced if such is the clear meaning of the language used, and the intention of the parties using that language."

[12, 13] We come now to the second proposition upon which the appellants rely in support of their contention that there has been no such default in the payment of dividends as would entitle the preferred stockholders to the relief accorded them by the court. This proposition is that if the appellees are right and the appellants are wrong in saying that there was no surplus out of which the dividends could be paid, then upon a proper construction of the charter no dividends had become payable. This, it will be observed, assumes that the corporation had no surplus from which the dividends could be paid, and asserts as a conclusion from that fact that *there were no dividends payable,* and hence no default. It is conceded by all parties that the directors had no right to pay dividends except out of surplus or net profits.

It is contended, in the first place, by the appellees, as an answer to the proposition here under consideration, that it is wholly inconsistent with and contradictory of the other main proposition relied upon by the appellants, namely, that the company had an abundant surplus, and that, therefore, the appellants have no right to assert it in this cause, relying upon the well recognized rule that "a party is forbidden to assume successive positions in the course of a suit or series of suits in reference to the same fact or state of facts which are inconsistent with each other and mutually contradictory." (*C. & O. Ry. Co.* v. *Rison*, 99 Va. 18, 37 S. E. 320.) We think, however, that the appellants are not precluded from making the defense here under consideration by reason of the rule just quoted. They had the right on the contrary to claim, first, that there were abundant assets out of which the dividends would have been paid but for this litigation, and in the alternative to contend that even if the appellees are right in the averment that there were no surplus or net profits, then upon the appellees' own showing and under a proper construction of the statute, there had been no default.

But as a second answer, the appellees say that the proposition under consideration is clearly unsound; and in this contention we concur.

No authorities are cited in its support, and no reasons are given therefor which seem to us to meet the plain meaning of the charter. The alternative contention here relied on was not set up in the lower court until near the conclusion of the hearing there. All the pleadings and the whole attitude and course of conduct on the part of the appellants show that they understood the charter to mean that failure to pay four quarterly dividends, from any cause whatsoever, would pass the voting power to the preferred stockholders for the elec--

·tion of directors. This is clearly what the charter did mean, and, with great deference to counsel, we deem it unnecessary to further prolong the discussion on this ·point.

[14] The order of the court directing a meeting of the ·preferred stockholders did not require any notice to be .given to the common stockholders, and it is insisted that this was error.

The by-laws of the corporation provide that "written notice of the annual meeting shall be mailed to each stockholder at his address as the same appears on the stock book of the corporation, irrespective of whether such stockholder shall be entitled to vote at such meeting or not, at least twenty-one days prior to the meeting," etc.; and the charter provides that the meeting of the preferred stockholders, to be held after four defaults in the payment of the quarterly dividends, for ·election of directors, shall be "upon notice similar to that provided in the by-laws for an annual meeting." We think the court was right in holding that these provisions, when properly construed, did not require any notice to the common stockholders for the meeting here in question. Such a meeting, it must be observed, is wholly different from an annual meeting. It is, as ·clearly prescribed by the charter, "a meeting of the pre- ·ferred stockholders," and is to be held solely for the purpose of electing directors. An annual meeting is a .general stockholders' meeting, which both classes of stockholders are entitled to attend, and at which both ·classes are entitled to vote upon all matters except the ·election of directors. The provision in the charter requiring that notice of a preferred stockholders' meeting for the election of directors shall "be similar to that re- ·quired by the by-laws for an annual meeting," is to be ·construed as prescribing the method and form of notice,

and not as designating the parties to whom such notice shall be sent. Practically the same situation would arise under the terms of the charter providing that upon payment of all accumulated and defaulted dividends on the preferred stock the terms of office of the directors elected by the preferred stockholders shall terminate and their successors shall be elected "at a meeting of the holders of the common stock." This latter meeting would be a meeting merely of the common stockholders for the sole purpose of electing directors, and as to it the preferred stockholders would have neither the right to attend nor the right to demand notice thereof.

We conclude, therefore, that the order complained of is right and must be affirmed.

*Affirmed.*