# Richmond

## Mosell Realty Corporation v. Dora Schofield, Trading As Schofield & Herman.

April 23, 1945.

Record No. 2886.

Present, All the Justices.

The opinion states the case.

*Earl W. White* and *Herman A. Sacks,* for the plaintiff in error.

*William G. Maupin,* for the defendant in error.

Eggleston, J., delivered the opinion of the court.

Dora Schofield, trading as Schofield & Herman, a licensed real estate broker, has recovered a verdict and judgment against Mosell Realty Corporation for services as a broker in procuring a purchaser for the corporation's real estate. We are asked to reverse the judgment on the ground that the evidence is insufficient to sustain the verdict and the

---

[1] The evidence was heard and the verdict of the jury rendered before Hon. Allan R. Hanckel who died while a motion for a new trial was pending. The motion was heard and the final judgment entered by Hon. Clyde H. Jacob, his successor.

judgment. The main contention is that the president of the corporation, with whom the contract sued upon was alleged to have been made, lacked the necessary authority to enter into it.

In view of the jury's verdict, the facts may be stated thus:

Mosell Realty Corporation is a close corporation. The capital stock is distributed equally among Sol Kaplan, L. H. Goldman, and Leon Banks, who are its only directors. Kaplan is the president, Goldman the vice-president, and Banks the secretary and treasurer.

The corporation owns a valuable piece of property located at the southeastern corner of Colonial avenue and Thirteenth street, in the city of Norfolk, on which are located a moving picture theatre and four stores. This is the only property the corporation owns or has ever owned. All of the buildings are occupied by tenants and the leases were arranged through Banks, who is engaged in the real estate rental business in Norfolk and who attends to the collection of the rents and the matters incidental thereto. Kaplan likewise lives in Norfolk, while Goldman lives at Durham, North Carolina.

In October, 1940, A. Sigourney Herman, a salesman employed by Dora Schofield, obtained a prospective purchaser of the property. He knew that the property was owned by the Mosell Realty Corporation and that Sol Kaplan was its president. Accordingly, he called on Kaplan at the latter's place of business and inquired whether the property was for sale, and if so, at what price. Kaplan told Herman that the property was for sale at the price of $50,000 net to the owner, and authorized him to sell at that price. He also told Herman that there was a mortgage indebtedness on the property, held by a local bank which would give him the details thereof, and that Banks, the rental agent, would give him the data with respect to the leases.

Herman obtained from Banks the desired information as to the leases on the property. When he advised Banks, in reply to the latter's inquiry, as to the price quoted by Kap-

lan, Banks' reply was: "That is all right." Banks questioned neither Kaplan's right to authorize the sale of the corporation's property nor the adequacy of the price named by him.

Shortly thereafter Herman visited Kaplan with his prospect, one Joseph Silverberg of Baltimore, Maryland, who wanted to buy the property but was willing to pay only $45,000 for it. Kaplan stood out for a price of $50,000 net to the corporation and the deal failed because the buyer was unwilling to pay the price demanded. No question was raised by Kaplan as to his authority to negotiate a sale for the corporation.

In 1941 Herman interested another purchaser in the property but no offer from him was obtained.

No further negotiations for the sale of the property were had until the early summer of 1943, when Herman obtained two prospects for its purchase. Because of the lapse of time since his original authority, Herman returned to Kaplan and asked whether he (Herman) was still authorized to sell the property at the same price. Kaplan's reply was: "That is still all right. I will accept such an offer." Immediately after this conversation with Kaplan, Herman again consulted Banks and obtained from him the status of the leases on the property. Again, neither Kaplan nor Banks raised any question as to Kaplan's authority to negotiate a sale of the property.

On June 28, 1943, Herman obtained from one D. Galanides a written offer to buy the property at the sum of $51,000. The offer was accompanied by a deposit of $500. Herman presented the offer and check to Kaplan who examined and approved them but requested that Herman hold them, saying that he (Kaplan) was leaving for New York that afternoon. Kaplan further said that upon his return "I will accept the offer." Herman called upon Kaplan upon the latter's return from New York. In the meantime Herman had obtained a written offer from Harry Kramer, accompanied by a deposit of $500, to purchase the property at $52,500. Herman presented both the Galanides and Kramer offers to Kaplan who refused to accept either,

because he said that on his trip to New York he "happened to see Goldman" who informed him (Kaplan) that he (Goldman) was not willing to sell the property.

Kaplan denied having made this statement to Herman as to the interview between him (Kaplan) and Goldman in New York. He testified that no such interview took place. Goldman likewise testified that there was no such interview or conversation, and that the first intimation he had about the negotiations for the sale of the property was contained in a letter to him from Banks after the present suit had been brought. Indeed, Goldman said, the subject of the sale of the property at any price had never been discussed by Kaplan, Banks and himself, who constituted the board of directors and were the holders of all of the capital stock of the corporation.

Banks, the secretary and treasurer of the corporation, testified that the corporation had authorized no one to sell the property.

While counsel for both parties indicated at the trial that they desired to offer in evidence the minute books of the corporation, so far as the record shows they were not produced. Apparently the corporation held only the formal annual meetings of its board of directors. Goldman admitted that he received notice of such meetings, but the record is silent as to whether he attended them.

Although the record discloses no formal resolution of the board of directors or stockholders authorizing Kaplan, its president, to sell this property, which, as has been said, was the corporation's principal asset, or to enter into the brokerage contract to effect such a sale, the defendant in error contends that such authority is sustainable on two theories: First, Kaplan, as president of the corporation, had the implied or inherent authority to enter into the contract sued on; and, second, the directors of the corporation clothed him with the apparent authority to enter into the contract sued on, and hence they and the corporation are estopped to deny the lack of actual authority therefor. In our opinion, neither of these contentions can be sustained.

It is well settled that the inherent or implied authority of a corporate president is limited to acts within the ordinary course of its business and does not extend to extraordinary and unusual transactions such as the sale and purchase of real estate.

As is said in 13 Am. Jur., Corporations, sec. 939, p. 900, "By virtue of his office alone, no executive officer or agent of a corporation has any authority to sell or make a contract for the sale of the real estate of the corporation. Thus, the secretary has no such power, nor has the president." See also, Fletcher Cyclopedia Corporations, Perm. Ed., Vol. 2, sec. 605, pp. 508-9; *Mack Realty Co. v. Beckley Hdw., etc., Co.,* 107 W. Va. 290, 148 S. E. 122, 123; *Lawrence v. Montgomery Gas Co.,* 88 W. Va. 352, 106 S. E. 890, 894.

In *Sterling v. Trust Company,* 149 Va. 867, 141 S. E. 856, this court held that the secretary and treasurer of a corporation engaged in the automobile and garage business did not have the authority to bind the corporation for the purchase of an expensive piece of real estate for the purpose of enlarging its business, even though such officer held approximately fifty per cent. of the capital stock of the corporation, was one of its three stockholders, and one of its four directors. We there pointed out (149 Va., at pages 877, 878) that such authority was lodged in the board of directors of the corporation.

The same principles apply to the sale of a corporation's real estate.

If a corporate president is without implied authority, by virtue of his office, to sell a part of the real estate of the corporation, *a fortiori* he is without implied power to negotiate a sale of the real estate which, as here, constitutes the corporation's principal asset. Fletcher Cyclopedia Corporations, Perm. Ed., Vol. 2, sec. 606, pp. 515, 516.

Neither do we think that the verdict and judgment here can be sustained under the principle that the corporation clothed its president with apparent authority to enter into

the contract sued on and for that reason is estopped to deny that it actually authorized him to do so.

True it is that, "A corporation is subject, to the same extent as a natural person, to the general principle that one who holds out another, or allows him to appear as having authority to act, as his agent with respect to his business generally, or with respect to a particular matter, cannot, as against persons dealing with him in good faith, deny that his apparent authority is real." Fletcher Cyclopedia Corporations, Perm. Ed., Vol. 2, sec. 449, p. 257. *Sterling* v. *Trust Co., supra* (149 Va., at pages 879, 880); *Bardach Iron, etc., Co.* v. *Charleston Port Terminals*, 143 Va. 656, 673, 129 S. E. 687.

But as it is aptly said in Restatement of the Law, Agency, Vol. 1, sec. 52, p. 131, "Unless otherwise agreed, authority to act in the principal's business does not include authority to sell the principal's interests in land, unless the business entrusted to the agent includes the selling of land."

And, continuing, the author says (Vol. 1, sec. 52, p. 132): "Ordinarily, an authority to conduct a business, no matter how general, does not include authority to . sell things necessary for the operation of the business as it is ordinarily conducted. Thus, where the premises upon which a business is conducted are owned by the principal, it is inferred that a manager of the business has no authority to sell them or any portion of them." See also, Mechem on Agency, 2d Ed., sec. 802, p. 576; 2 Am. Jur., Agency, sec. 140, p. 112.

Let us examine the evidence here in the light of these principles. This corporation owns a single piece of real estate which is the only property it. has ever owned. It is not engaged in the business of buying and selling real estate.[2] Its only business is that of leasing the property and

---

[2] The defendant in error prints as an appendix to her brief the charter of the corporation which lists "the purposes for which it is formed," among others, "to buy, sell, * * * and generally deal in improved or unimproved real properties, * * * ."

Aside from the fact that the charter was not offered in evidence and hence is not a part of the record, the fact that the corporation was chartered for these purposes is, of course, no evidence that it actually engaged in such business.

such matters as are incidental thereto. This business the corporation entrusted to Banks as its rental agent. Whether the directors, by formal action, authorized this agency we do not know. But even if it did not do so, the board clothed the rental agent with the apparent authority to execute the necessary leases and to do such things as were incidental thereto.

We may assume that Kaplan cooperated with Banks to such an extent that each had the apparent authority to negotiate and execute the leases and to carry out the necessary details, and that Goldman acquiesced therein. If so, leasing the property and attending to the matters incidental thereto were the limit of Kaplan's and Banks' authority. The fact that they had the apparent authority, or even the actual authority, to lease the property did not carry with it the implied authority to sell.

The precise question was involved in *Mack Realty Co. v. Beckley Hdw., etc., Co., supra.* After holding that the agent there had the apparent authority to rent the property in question, the court said (148 S. E., at pages 123, 124): "However that may be, power to lease is radically different from power to sell. The one indicates an intention to retain the property, the other an intention to dispose of it. Therefore authority to sell cannot be implied from authority to lease. 'If the agency arises by implication from numerous acts done by the agent, with the tacit consent or acquiescence of the principal, it is deemed to be limited to acts of the like nature. * * * An implied agency is never construed to extend beyond the obvious purposes for which it is apparently created.' Story [Law of Agency], *supra,* sec. 87." See also, 2 C. J. S., Agency, sec. 114, p. 1327; *Grant v. Burrows,* 139 Ark. 16, 212 S. W. 95, 98; *Rhodes v. Downing,* 13 Ala. App. 494, 68 So. 788, 791.

It is true that under the testimony on behalf of the plaintiff below the jury had the right to infer that two of the directors of the corporation (Kaplan and Banks) had acquiesced in the contract here sued on. But there is no such evidence as to Goldman, the third director. According to

Kaplan's statement, as related by Herman, when Kaplan mentioned the subject of a proposed sale to Goldman, in New York, Goldman immediately expressed his unwillingness to sell the property and thus repudiated the transaction. And yet the effect of the judgment below is to hold Goldman's interest in the corporation liable for one-third of the recovery.

But aside from this, the fact that Kaplan and Banks owned a majority of the stock of the corporation, and constituted a majority of its board of directors, gave them no authority to bind the corporation in any such informal manner.

It is elementary that the authority of the directors is conferred upon them as a board, and they can bind the corporation only by acting together as an official body. A majority of them, in their individual names, cannot act for the board itself and bind the corporation. *Starring* v. *Kemp*, 167 Va. 429, 435, 188 S. E. 174, 177, 190 S. E. 163; *Mack Realty Co.* v. *Beckley Hdw., etc., Co., supra* (148 S. E., at page 123); 13 Am. Jur., Corporations, sec. 948, p. 909.

As this court, speaking through Mr. Justice Holt, said in *Starring* v *Kemp, supra* (167 Va., at page 435, 188 S. E., at page 177), "The directors of a corporation must act in their corporate capacity, as a board in orderly procedure, and not as individuals; * * * ."

Nor did the fact that Kaplan and Banks own two-thirds of the capital stock of the corporation, in the absence of statute, vest in them the authority to bind the corporation outside of a formal stockholders' meeting. *Sterling* v. *Trust Co., supra* (149 Va., at page 880); *Mack Realty Co.* v. *Beckley Hdw., etc., Co., supra* (148 S. E., at page 125); 13 Am. Jur., Corporations, sec. 416, p. 469.

Under Code, sec. 3820a (Acts 1930, ch. 357, p. 791, as amended by Acts 1936, ch. 179, p. 302, Acts 1940, ch. 49, p. 57), a corporation such as that whose rights are here involved, may sell its entire assets "when in the judgment of the board of directors it is for the interest of the corporation" to do so, upon "the written consent of the holders of

two-thirds of all the stock of the corporation issued and outstanding." But here neither the required action of the board of directors nor the written consent of the stockholders was obtained.

The plaintiff below insists that the contract here sued on is merely a contract of employment entered into between her and the president of the defendant corporation, and that its validity does not depend upon the authority of the president to enter into a contract for the sale of the corporation's real estate. The answer to that argument is obvious. If the president of the corporation had no authority to enter into the main contract to sell the corporation's property, he likewise had no authority to enter into the incidental contract of employment with the plaintiff to make such a sale. If he lacked the authority to sell the property himself, he necessarily lacked the authority to employ the plaintiff to make such sale. What he could not do directly he could not do through another.

On this subject Fletcher Cyclopedia Corporations, Perm Ed., Vol. 2, sec. 598, p. 486, says: "If the president of a corporation is without apparent authority to bind the corporation by a contract to sell its property, he is without power to contract for the corporation to compensate one for making a sale." The text is supported by these authorities: *Caddy Oil Co.* v. *Sommer*, 186 Ky. 843, 218 S. W. 288, 291; *Thompson* v. *North Star Muskrat Farm*, 183 Minn. 314, 236 N. W. 461; *Abraham Lincoln Life Ins. Co.* v. *Hopwood*, 81 F. (2d) 284; *McCorry* v. *Wiarda & Co.*, 149 App. Div. 863, 134 N. Y. S. 667, 669.

Since the evidence before us shows that Kaplan, the president of the corporation, lacked the necessary authority to enter into the contract sued on, it follows that the judgment complained of must be reversed and a final judgment entered for the defendant corporation.

*Reversed and final judgment.*

HOLT, J., dissenting.

It is not contended that Kaplan, merely by virtue of his office, had authority to execute to any one a valid deed to this property or to give to one a binding option. As I see it, the circumstances plainly indicate that he and Banks had authority, acting jointly, to do either of these things.

Goldman, the third associate, lived in North Carolina. He appears to have taken no active interest in the corporation or its management but to have turned over complete control of it to his Norfolk associates. He was vice president but did not know it. Kaplan, however, did tell Herman that he had seen Goldman in New York and that Goldman was unwilling to sell. Later he said that he did not see Goldman there and was not on speaking terms with him.

Kaplan, in the beginning, sent Herman to Banks and told him that Banks would give him all the necessary information. Herman then promptly went to see Banks, who furnished him with the information which appears in the following memoranda:

In a memorandum book in which is listed properties for sale this appears on one page and on the back of the sheet that which follows appears:

"Ex. A

BUSINESS PROPERTY
FOR SALE

Date
10/4/40

PURCHASE PRICE ........................... $ 52,500.00

Location—S. E. Corner Colonial Avenue and 13th Street.

Nos. 1210-1212-1214-1216 & Visulite Theatre Colonial Avenue.

Assessment—Bldgs: $21,000.00—Land: $11,700.00

Construction—Brick with gravel roof. Property (3½ years old.)

Lot Nos. 8-9-10-11 & 12.  Block 15
Plat of Fairmount Land and Building Corpora-
     tion.
Size of site 168.6 on Colonial X 115 on 13th St.

PRESENT INCOME.
Visulite Theatre          $200.00  (25)*
1216—Drug Store           100.00  (25)*
1214—Barber Shop           50.00
1212—Beauty Shop           35.00  (44)*
1210—Flower Shop           75.00  (85)*
                          _____
          Monthly .....$460.00     Annual $5,520.00

EXPENSES.
Taxes .................$692.28  (817.50)*
Agents ................. 276.00
Insurance .............. 201.42
Incidentals ............ 100.00     $1269.70  (1394.92)*
                        _____
Annual Net Income.................$4250.30  (4125.08)*

INSURANCE—
        Fire and Liability on
        Theatre—3 years....$308.87
        Stores—Fire & Plate
        Glass—3 years       $295.37
                          _____
Total  premiums  for  three
   years                  $604.24

Owner—Mosell Realty Corporation.  (Sol Kaplan)
 See Leon Banks, 306 E. Plume St.  'Phone 21841

Bal. on loans: (Approx. $24,500)

LOAN—$28,500.00 at 4½ % interest, curtail
        $1500.00 annually, payable quarterly.
        Held by the National Bank of Commerce.

        *These figures in parenthesis appeared on the original memorandum in
pencil.

Apr. 6/43—Bal. on loan $24,000.00—Curtail $1500.00 4/6/44-4/6/45-4/6/46 and balance of $19,500.00 due 4/6/47

Building has just been painted and in perfect condition.

Theatre is Air Conditioned and this equipment will remain as part of the premises.

Theatre has a fifteen year lease, which has run 3½ years, and the rent increases every 5 years. Likewise the Flower Shop and Drug Store rent increases. On January 1st, 1942, the monthly rentals will be $520.-00, which will then show a NET INCOME OF $4970.30.

Theatre rent Mar. 1937 to Mar. 1942 $200.00 mo.
      Mar. 1942 to Mar. 1947 $225.00 ”
      Mar. 1947 to Mar. 1952 $250.00 ”
Flower Shop—Oct. 1, 1941     85.00 ” 1 yr.
Drug Store—Expires Oct. 1, 1942   $125.00 ”

New Rents:
Flower Shop. 5 yr. lease from Sept. 1942—$85.00 1st year; $90.00 2nd year, $95.00 3rd yr. & last 2 yrs. at $100.00. Beauty Shop—3 yrs. at $40.00 mo. starting latter part this year.”

This memorandum on its face tells us that it was intended for a prospective or a possible purchaser. It is an inducement held out to them.

It is all that might have been expected of an owner. The theatre was under a fifteen year lease; it might as well have been under a twenty-five year lease.

It is said that the property in litigation is all of the real estate owned by this corporation. Its name is "Mosell Realty Corporation." Its charter is a public record, recorded in Norfolk, and to it every Norfolk citizen had convenient access. Among powers conferred is the power to buy and sell real estate. The extent of its holdings were not known

to Herman or to any of the would-be purchasers. These would-be purchasers were interested in the particular bit of land. There was no occasion for them to inquire as to the other properties which might have been owned by it and in which they were not interested.

Plaintiff during the trial called for minutes of directors' meetings. The defendants promised to furnish them but never did. There were three of these directors' meetings between 1940 and June, 1943, and if Goldman was not on speaking terms with Kaplan, Banks was. One would not readily believe that Banks, who at least was on speaking terms with Goldman, would have failed at one of these meetings to tell him of the outstanding $50,000 option, or that some note of it did not appear in one of the minutes of directors' meetings called for but not produced. The truth is that Goldman left with his Norfolk associates entire control and management of this Norfolk property and nobody objected to the $50,000 option given in 1940, when it appeared to be above current market value, and not until 1943, when there had been a marked increase in values in Norfolk city, was there any objection made by anybody. It is then that the gentleman in the woodpile spoke.

Of course if a jury had seen fit to accept Goldman's statement—the substance of which is he knew nothing about what his Norfolk associates were doing; that their authority was limited, and that they had no authority to sell, express or implied—they had a right to do so. But the trouble is that they did not. They had at least as much authority to draw inferences from circumstances as we have. They were simple men, not learned in the law. The presiding judge agreed with them.

Authority of these Norfolk associates to sell may be proven by direct evidence; it may be proven by direct evidence and by circumstances, and it may be proven by circumstances alone, as authorities hereafter noted abundantly show.

Guileless faith may carry us far. It took Daniel out of the

lion's den, but skepticism has crept into the Twentieth Century and, in current argot, some of us are from Missouri.

A distinguished member of this court, commenting upon testimony which did not accord with the common experience of mankind, once said that "Those who will may believe."

These authorities show that circumstances alone may suffice:

The law on this subject is thus stated in 1 Mechem on Agency (2d ed.), section 299, quoted by us with approval in *Lysle Milling Co.* v. *Holt & Co.*, 122 Va. 565, 95 S. E. 414:

"It is impossible to lay down any inflexible rule by which it can be determined what evidence shall be sufficient to establish agency in any given case. That is a question which must be determined in view of the facts in each particular case. Whatever form of proof is relied upon, however, must have a tendency to prove agency, and must be sufficient in probative force to establish it by a preponderance of the evidence. It may be said in general terms, however, that whatever evidence has a tendency to prove the agency is admissible, even though it be not full and satisfactory, as it is the province of the jury to pass upon it. So if evidence has first been introduced tending to prove the agency, or to make out a *prima facie* case thereof, the admissions and declarations of the alleged agent, if otherwise competent, may then be shown, and the whole case be passed upon by the jury."

In 13 Am. Jur. p. 870, it is said:

"It is a fundamental and well-settled rule that when, in the usual course of the business of a corporation, an officer or other agent is held out by the corporation or has been permitted to act for it or manage its affairs in such a way as to justify third persons who deal with him in inferring or assuming that he is doing an act or making a contract within the scope of his authority, the corporation is bound thereby, even though such officer or agent has not the

actual authority from the corporation to do such an act or make such a contract. This authority is known as apparent or ostensible authority. This apparent authority is materially the same and is based upon the same principles as authority by estoppel. Stating the rule in terms of estoppel, a corporation which, by its voluntary act, places an officer or agent in such a position or situation that persons of ordinary prudence, conversant with business usages and the nature of the particular business, are justified in assuming that he has authority to perform the act in question and deal with him upon that assumption is estopped as against such persons from denying the officer's or agent's authority."

More than half a page of authorities are cited, among which is *Martin* v. *Webb*, 110 U. S. 7, 3 S. Ct. 428, 28 L. Ed. 49. In that case it appears that a bank cashier cancelled certain notes due to his bank and released the liens of trust deeds given to secure them. Mr. Justice Harlan said:

"Strictly speaking, he may not, in the absence of authority conferred by the directors, cancel its deeds of trust given as security for money loaned—certainly not, unless the debt secured is paid. As the executive officer of the bank, he transacts its business under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier—at least where its charter does not otherwise provide—in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. *His authority may be by parol and collected from circumstances.*" (Italics supplied.)

We may approach this subject from other angles:

We have seen that no question of authority of the Norfolk resident owners to sell arose until values rose. There were three intervening annual meetings of directors. These meetings were under the complete control of these Norfolk directors. They could, without trouble, have voted to

ratify the options which they themselves had given, if they thought it was necessary, or they might have called a special directors' meeting for that purpose. Again, since these Norfolk men controlled the board of directors and owned two-thirds of the stock, they might, under Code, section 3820a, by following the procedure there marked out, have proceeded to sell this real estate and to wind up their corporation's affairs. Neither of these courses was adopted, and for this reason: They were not deemed necessary; they knew that its entire control had been left with them. They entertained no doubt about their authority to sell and never had any doubt until a purchaser was found in 1943 who was willing to pay $52,500, which would have still left them with but $50,000 while the agent would have gotten $2500. The ostensible reason then advanced was that Goldman, their associate, would not go with them—an associate who had so little to do with this Norfolk holding that the fact that he was vice-president was news to him.

With these matters before them, how can it be said that neither evidence nor circumstances supported the jury's verdict?

SPRATLEY, J., dissenting.

I am of opinion that the judgment against the corporation should be affirmed.

I have no quarrel with the legal principles enunciated in the opinion of the majority. My departure from their conclusion is based on my evaluation of the evidence and fair and reasonable implications therefrom. I reach the same conclusion as the members of the jury who saw and heard the witnesses testify.

The evidence is in sharp and direct conflict. It presents a picture of double dealing by the officers of the corporation, who talk and act one way when it is to their supposed advantage and another way when they are fearful of a

prospective loss. Their testimony is actually in conflict as between themselves.

The Mosell Corporation is a close corporation, its stock being owned in equal shares by three men, Kaplan, its president, Goldman, its vice-president, and Banks, its secretary and treasurer. Kaplan and Banks resided in Norfolk, where the property of the corporation was located, Goldman in Durham, North Carolina. By common consent, all of its business and affairs were handled by Kaplan and Banks. They were so held out to the public. Nor, so far as we know, were their powers restricted under the by-laws of the corporation. Although there was a request to produce the by-laws, they were withheld from the record. Goldman did not require that he be consulted with reference to the corporate affairs. He accepted the judgment and transactions of the other two officers and went along with them, taking the gains and profits and absorbing the loss, if any. He took no part in the conduct or management of the corporate business or purposes. In fact, he testifies that he did not even know that he was an officer of the corporation and attended only an annual meeting of the board of directors.

During several separate negotiations for the sale of the property, including that here involved, no question was raised as to Kaplan's authority to bind the corporation. The charter itself, now that we know its provisions, contradicts the testimony of Kaplan and Banks that it was not organized to engage in the buying and selling of real estate.

The evidence of the appellee supports the finding that Kaplan and Banks were held out to the public as having full and complete authority to act in all matters for their principal, including full authority to dispose of its real estate holdings. They were more than merely rental agents, they were the chosen agents to do any and all things which might result in a gain to their corporation. This apparent authority was not denied until Kaplan thought it was to his advantage to repudiate the contract made with the appellee.

To justify that denial he stated that he had been told by Goldman in an interview with the latter that Goldman was not willing to sell the property. Goldman denied that there was any such interview or that he had been consulted about the sale. It seems apparent that Goldman did not expect to be consulted, and it was only after Kaplan had disavowed the contract that the present attitude of Goldman was sought to support the position taken by Kaplan.

The facts were peculiarly for the jury. Their verdict is binding on us because, as I see it, it is supported by evidence to the following effect:

The defendant in error dealt with Kaplan as authorized agent of the corporation. He would not have attempted a sale of the property if he had not been assured by the actions and attitude of both Kaplan and Banks, the president and the secretary and treasurer of the corporation, that the property was for sale. The nature of the information requested from them, the amount of the indebtedness against the property, the details of its leases and the amount demanded of the purchaser signified clearly the purpose of the defendant in error. None of this information, especially that of a private nature and the sale price of the property, fixed by those controlling the property, would have been furnished otherwise, nor unless a sale of the property was contemplated and desired by the corporation.

It appears that Kaplan had full authority when anything was to be gained but none when anything was to be lost. We should, therefore, give Kaplan the character which the close corporation through all of its stockholders and directors saw fit to confer on him when dealing with the defendant in error rather than the character which they now see fit for the occasion to assume. Under the peculiar circumstances common sense should govern rather than the strict legal principle applicable under a different situation. See *Paramount Communities* v. *Abramson, post,* p. 922, 33 S. E. (2d) 771, as to the effect of the actions of the officers of a close corporation, and *Moore* v. *Aetna*

*Cas., etc., Co.,* 155 Va. 556, 568, 155 S. E. 707, and cases therein cited.

For these reasons and those given by Mr. Justice Holt, I join in his dissent.