# Richmond

COASTAL PHARMACEUTICAL CO., INCORPORATED v. MILTON S. GOLDMAN, M. D.

April 23, 1973.

Record No. 8099.

Present, All the Justices.

*Edward R. Parker (George Minor, Jr.; Parker, Fenderson & Pollard, on brief), for appellant.*

*Robert M. White (Edwin C. Kellam; Kellam, Pickrell & Lawler, on brief), for appellee.*

POFF, J., delivered the opinion of the court.

This is an appeal by Coastal Pharmaceutical Co., Incorporated, from decrees entered by the chancellor on August 17, 1971 and December 6, 1971 on a bill of complaint filed by Milton S. Goldman, M. D., praying for rescission of a written agreement dated January 17, 1971 to effect a sale by Goldman to Coastal of all of the stock of Ghent Arms Corporation, owner and operator of Ghent Arms Nursing Home in Norfolk. In his two decrees and his letter opinion dated July 21, 1971 the chancellor ruled that because Coastal had never authorized

execution of the agreement by formal corporate action or ratified it by timely corporate action or by implication, the agreement "never became a valid mutually binding and enforceable contract"; that the agreement was "null and void"; and that "the parties shall be returned to their status quo".

On March 12, 1971, the same day the bill was filed, the chancellor conducted an *ex parte* hearing and, pursuant to the prayer and upon a finding that "an emergency exists with regard to the safety and well-being of the patients in the Ghent Arms Nursing Home", entered a temporary injunction banning from the premises for 30 days Coastal's officers, agents and employees who, some fourteen months earlier, had assumed managerial authority over the nursing home. The injunction was conditioned upon Goldman's bond in the sum of $10,000.00 which was duly posted. Coastal, which had received no notice of the hearing, moved to vacate the injunction. The motion was overruled, the injunction was extended, and trial on the merits began on April 30, 1971.[1]

The evidence showed that Goldman was sole owner of the three shares of stock issued by Ghent Arms Corporation when it was chartered in 1964 to operate the seventy-bed nursing home. In compliance with state license requirements, Agnes Dukovich was employed as registered nurse at the head of a staff of fifty-two employees, and Goldman's wife was licensed as nursing home administrator.

To finance the nursing home, Goldman pledged his personal guaranty, his residence and two life insurance policies to secure loans aggregating about $500,000.00. Except for one year in the 1964 to 1969 period, the home operated at a loss. In 1969, the loss was $34,560.00; mortgage payments were delinquent; $35,000.00 in Federal income tax withholding deposits were overdue; and $30,000.00 in other accounts payable were in arrears.

Goldman also bought five shares of stock in Coastal when it was

---

[1] On March 22, 1971 Coastal filed as its original pleading an answer and cross-bill alleging damages "in excess of $10,000.00" and praying that the injunction bond be declared forfeited. On April 28, 1971 Coastal filed an amended answer which contained no cross-bill but which prayed leave "to file such further and additional pleadings as it deems proper after a determination is made as to the relief sought in the Bill of Complaint." In a petition filed on April 30, 1971 alleging damages "brought on by the litigation" in excess of $500,000.00 and praying for an increase in the injunction bond, Coastal announced that it "will seek recovery for said damages either in law or in equity, after this Court returns or refuses to return possession of the nursing home to defendant." The record reflects no pleading responsive to the cross-bill or petition and no action by the chancellor thereon. Coastal assigns no error with respect to its claim for damages.

organized in 1948 as a pharmaceutical supplier. For 22 years it was owned and operated by doctors in the Norfolk area. Between 1962 and 1969, Coastal held no directors' or stockholders' meetings. In 1969 it had only one employee and its sales were only $5,000.00, yielding a profit of only $61.00.

In August 1969, pursuant to a plan to convert Coastal into a minority enterprise eligible for assistance under a federal aid program, Coastal employed James F. Gay, an attorney with training and experience in business management, as its managing director. In December 1969 Gay and Goldman met with William Berlin, Coastal's founder and president, to discuss a combination with Ghent Arms. The parties agreed to place Gay on Ghent Arms' payroll as acting administrator with the understanding that he would divide his time between Ghent Arms and Coastal. To help finance that plan, Coastal loaned Goldman, for the benefit of Ghent Arms, $3,500.00 on Goldman's personal note.

Coastal's stockholders elected Gay president in January 1970.

By reason of an increase in patient charges (paid in large part under the Medicare-Medicaid program), a Small Business Administration loan of $105,000.00, a reduction in the number of employees, and certain improvements in management techniques, Ghent Arms' 1969 operating loss was converted into a $30,270.00 net income for the first 11 months of 1970.

During the year 1970, Coastal's stockholders held a number of meetings. The record does not disclose any meetings of Coastal's board of directors that year.

The minutes of the January 11, 1970 stockholders' meeting record that "Dr. Sellers moved that Coastal negotiate to buy the Nursing home. This was seconded by Dr. Goodwin." The stockholders elected officers for 1970, including Goldman as medical advisor. Goldman was also elected a member of the executive committee and the medical advisory committee. All five members of the board of directors were present..

According to the minutes of the March 31, 1970 stockholders' meeting, it was decided that "[t]he Executive Committee will work on a formula for acquiring the home . . ."; that an appraisal would be made; and that consideration would be given to opening a drug store within the home as an outlet for Coastal's products. The minutes do not record the names of those present.

At the August 23, 1970 stockholders' meeting which Goldman attended, the minutes show that "[w]e would purchase the home and

take over all obligations. There would be an exchange of Stock among the purchasers of the Home. Dr. Owens motioned to appoint an executive Committee to negotiate to purchase the Nursing Home. This was seconded by Dr. Goodwin." All members of the board of directors were present.

In early January 1971, at a meeting at Goldman's home, Gay and Goldman reached substantial agreement on terms of the acquisition, and an attorney present at the meeting was asked to prepare a formal contract from their rough draft. Whether the attorney was employed by Goldman or Coastal is in dispute.

As recited in the minutes of a meeting of the board of directors of Ghent Arms Corporation on January 15, 1971, the directors adopted a resolution approving an agreement to sell its stock to Coastal. The resolution acknowledged that Coastal had assumed responsibility for the management of the nursing home in January 1970 and had "drastically improved" the condition of the home. Goldman signed these minutes as "approved".

On January 17, 1971 Coastal's stockholders met, and Gay reported the figures reflecting Ghent Arms' improved financial condition. Coastal's stockholders elected Goldman director, medical director, member of the executive committee and member of the board of trustees of Coastal Education Foundation. With all members of Coastal's newly-elected board of directors present, Coastal's stockholders also elected Goldman and six others as members of Ghent Arms Corporation's board of directors for 1971.

On January 22, 1971 Gay, acting as president of Coastal, and Goldman, acting for Ghent Arms, executed the formal contract and dated it January 17, 1971. Pursuant to the contract, Goldman gave Gay his Ghent Arms stock certificate, and Gay gave Goldman five shares of Coastal stock and Coastal's note for $21,500.00 and cancelled Goldman's $3,500.00 note. As Coastal's wholly-owned subsidiary, Ghent Arms Corporation was to execute a $90,000.00 note payable to Goldman and four notes payable to members of Goldman's family. These five notes were not executed at that time but were attached to Coastal's answer and cross-bill.

On March 2, 1971 Goldman was advised by his accountant who, in anticipation of a public stock offering, had audited the books of Coastal and Ghent Arms, that the sale of the nursing home was a mistake and that Coastal was on the verge of bankruptcy, unable to "go public" and altogether unable to pay off Ghent Arms' indebtedness within a

year as Goldman testified Gay had assured him it could do. Goldman charged that Gay had attempted to cash the life insurance policies pledged as security on Ghent Arms' indebtedness. Gay testified that he only suggested such a possibility as a means of financing the mortgage delinquency.

In a letter dated March 9, 1971 Goldman's attorney advised Coastal that Goldman was rescinding the contract. He enclosed in the letter the certificate for five shares of Coastal stock and the $21,500.00 note and asked that Goldman's Ghent Arms stock be returned. The same day, the stockholders of Ghent Arms met and, according to the minutes, Goldman and two others unconnected with Coastal were elected new directors on the grounds that Coastal "had failed to live up to the terms of their agreement".

On March 10, 1971 Coastal wrote letters to head nurse Dukovich and Goldman's daughter, an administrative employee of Ghent Arms, relieving them of their positions. Goldman testified that he feared that the absence of his only registered nurse would jeopardize the license of the nursing home and endanger the patients. Alleging an emergency, Goldman filed suit seeking a temporary injunction and rescission of the contract. On March 16, 1971 he resigned from Coastal.

On March 28, 1971 Coastal's board of directors met and authorized its president to employ counsel to defend the contract. At trial, the chancellor refused to admit evidence proffered by Coastal that on May 2, 1971, two days after trial had begun, Coastal's board of directors met and adopted a resolution ratifying the January 17, 1971 contract.

Coastal assigns a number of errors. The crucial question involved is whether the chancellor was correct in his ruling that because Coastal never authorized execution of the agreement by formal corporate action or ratified it by timely corporate action or by implication, the agreement "never became a valid mutually binding and enforceable contract".

In his bill of complaint, Goldman prayed for rescission of the contract on several grounds, viz., that the written contract document did not incorporate all of the rights and obligations of the oral agreement, that Coastal had failed to perform its commitments under the contract, that Coastal had misrepresented its financial condition as an inducement to the contract, and that Coastal's board of directors had not formally authorized its president to execute the contract.

Basing his holding on the last ground only, the chancellor decreed

that since no binding contract ever came into existence, rescission was unnecessary. We consider only the single question raised by that basis for the decree, and since we find that the chancellor erred, we leave the questions raised by the other grounds alleged in the bill of complaint for adjudication on remand.

We consider first Goldman's argument that neither the board of directors nor the stockholders formally authorized Gay to execute the contract and that the contract was therefore null and void.

This court has held that a corporation cannot escape liability for commercial commitments made by its officers in the name of the corporation by asserting a lack of *de jure* authorization by its board of directors. *Holstein Co.* v. *H. Kirk Sons*, 150 Va. 82, 142 S.E. 373 (1928). In *Moore* v. *Aetna Co.*, 155 Va. 556, 570, 155 S.E. 707, 711 (1930) we said:

> "Certainly a corporation should act through its board of directors, and in accordance with the limitations imposed by its charter and by-laws; but when, with the knowledge and acquiescence of all of its stockholders, it declines so to do, it must accept the consequences. It cannot be permitted to accept all the benefits of such irregular contracts without assuming all of the resulting liabilities."

Necessarily, the converse is also true; a corporation cannot be required to assume liabilities of such a contract and be denied its benefits. If implied or *de facto* authorization is sufficient to bind the corporation and its stockholders to obligations, it is sufficient to validate their rights.

Corporations are creatures of statutory law. The same law which creates them provides procedures for the conduct of their affairs. Ordinarily, corporate conduct must conform to those procedures. But the total complex of corporate law acknowledges that all corporations are not alike and recognizes that strict statutory conformity, seldom practiced faithfully by the largest and most sophisticated corporations, is impractical if not impossible for others. For the law to close its eyes to the differences and attempt to compress all corporations into a neat little mold would be to forsake realism for legalism and often to sacrifice justice for standardization. As we said in *Brewer* v. *First Nat'l. Bank*, 202 Va. 807, 812-13, 120 S.E.2d 273, 278 (1961):

> "While it is salutary, and in some instances mandatory, that these rules be followed, it is generally recognized that where there is a

family, or close corporation, such as the one involved in this case, in which the stockholders, officers and directors ignore the requirements of the statutes and corporate by-laws, and conduct its business in an informal manner, the actions so taken may, nonetheless, be binding upon the corporation. [Citations omitted.]

"In this case, the agreement of January 17, 1955, was not authorized at a formal meeting of the board of directors of the corporation, nor was the writing executed in the proper manner. However, it is clear from the actions of the parties, from the circumstances surrounding and subsequent to the execution of the agreement, and from the agreement itself, that it was intended, by all concerned, to be the *act of the corporation*." [Emphasis supplied.]

In *Holstein Co.* v. *H. Kirk Sons, supra*, the board of directors never met. Upholding the de facto authority of the officers to execute the corporation's note, we quoted with approval (150 Va. at 91, 142 S.E. at 375) the following from *Union Bank & Trust Co.* v. *Long Pole Lumber Co.*, 70 W.Va. 558, 564, 74 S.E. 674, 677 (1912), where the president of the corporation, without formal corporate authority, endorsed a note given the corporation:

"The issue involves not so much the authority actually conferred upon the president as that which he apparently had and exercised with the knowledge and consent or acquiescence of the board of directors. In other words, the inquiry goes to the extent of the power he was permitted to exercise rather than the extent of the power actually conferred."

With respect to the rule in *Brewer*, we are aware of the several definitions of a "close corporation" written by various scholars on and off the bench, and arguably Coastal falls within one or more of these. We fear the most precise definition may be imperfect to every occasion, and we find it unnecessary to choose among the scholars or to write a hard and fast definition of our own. It is enough to decide, and we do decide, that under the facts of this case, Gay was vested by Coastal with *de facto* authority to execute the contract as an "act of the corporation" within the spirit of the rule in *Brewer*.

The dispositive facts of this case, as distinguished from facts not relevant to the specific basis of the Chancellor's decree, are not in dispute. For a period of more than a year preceding execution of the

contract, Coastal and Ghent Arms were negotiating some form of combination. Goldman was the sole owner of one corporation and part owner of the other. The physical combination between the two corporations began originally in December 1969 when, under a $3,500.00 loan from Coastal to Ghent Arms, Gay, Coastal's managing director, went on Ghent Arms' payroll to serve both corporations. The combination took further form after Gay became Coastal's president a month later and, with other Coastal employees, assumed managerial authority over the nursing home. During 1970, with the home's financial condition improving, Coastal's stockholders, moribund for seven years, held three meetings, all of which Goldman attended. Although the minutes of these meetings were inartistically drafted and did not record conventional resolutions or categorical votes on informal motions, they clearly reflect a corporate purpose to authorize Coastal's officers to pursue the steps preliminary to corporate acquisition of the nursing home.

On January 17, 1971, Coastal's stockholders met again. That meeting and its date are both significant. At that point in time, an attorney was preparing a written contract to incorporate the oral agreement reached by Gay and Goldman a few days before; five days later, the written contract would be signed and pre-dated to January 17, 1971.

At that meeting, Coastal's stockholders treated Ghent Arms as their own. After hearing Gay's report of Ghent Arms' financial status, they proceeded to elect a board of directors for Ghent Arms Corporation for the year 1971, and they closed the meeting with a standing ovation commending Gay's management of the affairs of the corporation. In light of the preparatory action taken at earlier meetings, this exercise of dominion over the nursing home and the endorsement of Gay's conduct can be interpreted only as a corporate affirmation of the oral agreement Gay had made with Goldman and an implied authority for Gay to validate that agreement by signing the written contract.

Goldman contends that since this authority did not spring from the action of the board of directors, execution of the contract cannot be an "act of the corporation". True, directors normally conduct the business of the corporation. True, the several meetings in which the contract was authorized were called "stockholders' meetings". But, except for the minutes of the March 31, 1970 meeting (which did not record those present), the minutes show that all members of the board of directors attended all meetings. Nothing in these minutes indicates an objection by any director or any of the sixty-six stockholders. So

far as the record discloses, until Goldman decided on March 9, 1971 to rescind the contract, approval was unanimous, enthusiastic, and uninterrupted from beginning to end.

As to Goldman's argument that since only directors have statutory power to elect officers of a corporation, Gay was never legally elected and therefore had no legal standing to contract for the corporation, what we have said above is a sufficient answer. If not president *de jure*, Gay was president *de facto* and an employed agent of the corporation. With respect to his status as agent, the rule is succinctly stated in *Winston* v. *Gordon*, 115 Va. 899, 907, 80 S.E. 756, 760 (1914):

> "It is well settled, and is agreeable to reason, that an act of an agent, from which the agent derives no personal benefit, but which is done in good faith for the benefit of his principal, and which was apparently necessary and would redound to his advantage, will be held to have been ratified or acquiesced in, and be thereby rendered valid upon slight evidence. If the principal knows that an agent has transcended his authority, he must promptly disavow the act, or he makes it his own."

Except for the question of corporate authority to execute the contract, the questions raised by the grounds for rescission alleged in the bill of complaint were not adjudicated by the chancellor and are not before us. The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*