### Richmond

## Lake Motel, Inc.

### v.

## Aubrey D. Lowery, et al.

January 21, 1983.

Record No. 801036.

Present: All the Justices.

*Milton Paul Miller* for appellant.

*Don P. Bagwell (Chandler A. Nelson; Tuck, Bagwell, Dillard, Mapp & Nelson*, on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

By deed dated October 22, 1976, Lake Motel, Inc., a Virginia corporation (Lake), conveyed to Aubrey D. Lowery and Constance Y. Lowery, his wife (the Lowerys), a .374-acre parcel of land adjoining the Lake Motel in the Town of Clarksville.[1] On June 29, 1977, Lake filed in the trial court a bill of complaint seeking to have the deed declared null and void; the bill alleged that the corporate officers who executed the instrument were without authority to convey the land. By decree entered April 8, 1980, the trial court upheld the validity of the deed; Lake has appealed.

The record shows that in February, 1973, Edgar C. Bowlin, a motel operator and broker, interested Marshall R. Gass, Jr., in purchasing the Lake Motel; Gass, however, could not raise the $450,000 purchase price and asked Bowlin to become his "50 percent partner in the deal." Bowlin agreed, and he and Gass arranged a bank loan for $385,000 and secured the seller's agreement to finance the balance of the purchase price with a second mortgage.

---

[1] The case involves two other deeds from Lake to the Lowerys, one dated October 22, 1976, quitclaming Lake's right, title, and interest in and to a .027-acre parcel, and the other dated March 16, 1977, conveying a sewer line easement. Our holding with respect to the deed described in the text applies to these other deeds as well.

On February 28, 1973, Lake was issued a charter for the purposes of operating motels or hotels and of engaging in the sale and purchase of motel and hotel properties, including real and personal property. Gass was issued twenty shares of the corporation's stock and Bowlin an equal amount. Gass was named president, Bowlin vice-president, Mrs. Gass secretary-treasurer, and Mrs. Bowlin assistant secretary-treasurer. Mr. and Mrs. Gass and Bowlin were named directors.[2]

Title to the motel property was taken in the name of the new corporation, and Mr. and Mrs. Gass, as president and secretary, respectively, executed the papers evidencing the indebtednesses to the bank and the seller. The Gasses moved into the motel and, although inexperienced, undertook its operation. Bowlin, a resident of North Carolina, visited Clarksville once or twice a week. He trained the Gasses in the motel's operation and, throughout the period in controversy, checked on their activities. He required them to report to him daily on all aspects of the business, and he had his auditors examine their financial reports.

Concerning the parcel in question, the record shows that, in September, 1973, Gass advised Bowlin that the property might be available for purchase by Lake as a site for future expansion of the motel project. Bowlin flew to Clarksville, examined the property, and agreed with Gass that the corporation should attempt to acquire it. Gass negotiated with the owner and, in February, 1974, secured his agreement to sell the lot for $7,000; the property was conveyed to the corporation.

In October, 1976, Gass inquired of Bowlin whether he "would be interested in selling" the property. Bowlin testified below that he told Gass he had "no interest whatsoever . . . in selling that lot." Then, on October 24, Bowlin visited the motel and there met the Lowerys, the grantees in the disputed deed. His testimonial version of this crucial occurrence differed sharply from the version given by Mr. and Mrs. Lowery.

According to Bowlin, Gass told him during the visit that Mrs. Lowery, the motel's housekeeper, was the "prospective buyer" and that "it was just as well that [Bowlin] didn't want to sell the lot anyway because [Gass] was not able to get a clear survey to the

---

[2] During the latter portion of the period in controversy, the stock shares originally issued to Edgar C. Bowlin were owned by his father; however, Edgar continued active in the corporation's affairs as his father's agent and remained an officer and a director of the corporation. Hence, all references *infra* to Bowlin will mean Edgar C. Bowlin.

property." Bowlin then talked to Mrs. Lowery and told her "it was just as well that [they] couldn't get a survey on [the property] because [he] had no interest in selling it." Her only comment was that her husband had been talking to Gass about the matter.

Bowlin testified further that, following his conversation with Mrs. Lowery, he and Gass went to the lot and were "looking at the survey . . . stobs [with] red flags on them" when Mr. Lowery walked up. After Gass had introduced the two men, Bowlin mentioned the survey problem and told Lowery he had no interest in selling the property. Lowery's only reply was that "he had been negotiating or . . . dealing with [Gass] on it."

Mrs. Lowery testified, however, that in her conversation with Bowlin, he "never mentioned that lot in any way," let alone to say the property was not for sale. She said that "[a]ll he talked to [her] about was housekeeping troubles at the motel." Mr. Lowery testified that although Gass introduced him to Bowlin as "the gentleman [who] wants to buy this lot," Bowlin did not mention a survey problem or indicate any unwillingness to sell the property.

It developed that on September 29, prior to Bowlin's visit, Gass, as president of Lake, had entered into a written agreement to sell the lot to the Lowerys for $11,000 and, on October 26, executed, along with Mrs. Gass as corporate secretary, a deed conveying the lot to the Lowerys. The deed bore what purported to be Lake's corporate seal; during this period, however, Bowlin had the corporation's original seal in his possession at his office in North Carolina. Apparently, Gass had procured another seal.

The proceeds from the sale to the Lowerys were deposited in the motel's bank account. Lake concedes that the money was used to pay corporate expenses.

Meanwhile, during September, Gass had telephoned Bowlin and told him that the corporation needed funds "to make the mortgage payment." Because "it was the end of the season" and there should have been a surplus of cash on hand, Bowlin became suspicious. He investigated and discovered that Gass had not been including in his daily reports all the rooms that had been occupied at the motel. In October, Bowlin confronted Gass with "the fact that [he] felt like there was some misappropriation of funds, possibly embezzlement, possibly [employee] stealing." Gass's reaction was to throw Bowlin "off the [motel] property" on October 30. This was the last personal contact between Gass and Bowlin. Both

retained counsel, who undertook to settle the controversy between them.

Following negotiations, an agreement was reached whereby Gass would become Lake's sole stockholder, but he was unable to raise the necessary funds to consummate the transaction. Thereafter, he sold seven of his stock shares to a Clarksville attorney and apparently fled the jurisdiction. Ultimately, Bowlin acquired control of the corporation through purchase of the attorney's stock.

Bowlin testified below that he first learned on February 25, 1977, of the conveyance of the lot in question. On March 25, his counsel made written demand upon the Lowerys to reconvey the property to Lake because "[n]either the corporation nor . . . Gass as its president . . . had actual or apparent authority to effect the conveyance." At the time of the demand, the Lowerys had torn down an old dwelling on the lot and had partially constructed a new building; they ceased construction for approximately one week following receipt of the demand and then proceeded with the work, substantially completing the project in June, 1977. The present proceeding was instituted June 29.

■ On appeal, citing Code § 13.1-45,[3] Lake contends that the powers of corporate officers may be determined only by reference to the corporation's bylaws or to resolutions adopted by the board of directors not inconsistent with the bylaws. Lake concedes that Gass acted not only as the corporation's president but also as its general manager; however, Lake argues, no bylaw or board resolution authorized Gass to convey corporate real estate and no inherent or implied authority he possessed included the power to make

---

[3] At the time of the proceeding below, Code § 13.1-45 read:

§ 13.1-45. Officers and agents generally. — The officers of a corporation shall consist of a president, a secretary and a treasurer, each of whom shall be elected by the board of directors at such time and in such manner as may be prescribed by the bylaws. The president shall be a director. Such vice-presidents and other officers and assistant officers and agents as may be deemed necessary may be elected or appointed by the board of directors or chosen in such other manner as may be prescribed by the bylaws. Any two or more offices may be held by the same person, except the offices of president and secretary. If a corporation has only one stockholder, such stockholder may hold all offices.

All officers and agents of the corporation, as between themselves and the corporation, shall have such authority and perform such duties in the management of the corporation as may be provided in the bylaws, or as may be determined by resolution of the board of directors not inconsistent with the bylaws.

such a conveyance. Hence, Lake concludes, the conveyance should be voided.

In support of its position, Lake cites *Mosell Realty Corp.* v. *Schofield*, 183 Va. 782, 33 S.E.2d 774 (1945). There, the stock in a close corporation was owned in equal portions by Kaplan, the corporation's president, Goldman, its vice-president, and Banks, its secretary-treasurer; these three constituted the board of directors. Kaplan, with Banks' acquiescence, authorized a real estate agent to sell the only property the corporation owned, consisting of a parcel of land containing a theater and stores leased to various tenants. When the agent produced a purchaser and the proposed sale was presented to Goldman, he expressed his unwillingness to sell and "thus repudiated the transaction." 183 Va. at 793, 33 S.E.2d at 778. As a result, the sale was not consummated.

The agent secured a judgment against the corporation for a commission on the aborted sale. We reversed, stating that the "inherent or implied authority of a corporate president is limited to acts within the ordinary course of its business and does not extend to extraordinary and unusual transactions such as the sale and purchase of real estate." 183 Va. at 790, 33 S.E.2d at 777. We said also that any apparent authority with which the president might have been clothed did not include the power to sell the corporation's land, and, therefore, the corporation was not estopped to assert his lack of authority. *Id.* at 790-91, 33 S.E.2d at 777. Finally, we opined, the outcome of the case was unaffected by the facts that Kaplan and Banks owned a majority of the corporation's stock and constituted a majority of its board of directors. *Id.* at 793, 33 S.E.2d at 778.

*Mosell*, however, is readily distinguishable. In the first place, the transaction involved there contemplated a sale of the corporation's principal asset, one essential to its continued operation. The sale at issue here concerns only a minor holding, one not even used in the corporation's business. Second, Goldman, the third stockholder-director in *Mosell*, specifically repudiated the proposed sale when it was presented to him.[4] Here, while Bowlin testified he was unwilling to sell the property in question and had

---

[4] Lake also cites *Sterling* v. *Trust Co.*, 149 Va. 867, 141 S.E. 856 (1928), where we affirmed a decree voiding an offer made by one stockholder-director on behalf of a close corporation to purchase a lot for expansion of the firm's business. But, as in *Mosell*, when one of the other stockholder-directors learned of the transaction, he repudiated it. Hence, *Sterling* is inapposite here.

repudiated the proposed sale to the Lowerys when it was presented to him, the trial court rejected this testimony and found, in effect, that Bowlin had acquiesced in the sale.

In a written opinion, the trial court found that Bowlin, already doubtful of Gass's honesty and aware of his desire to sell the lot in question, visited the motel, learned that the Lowerys were the prospective purchasers, and viewed the lot, where he could see evidence that the property had been surveyed recently. Yet, the trial court noted, Bowlin did not tell the Lowerys when he talked with them that the lot was not for sale. To conclude otherwise, the court said, would "implicate [the Lowerys] in a conspiracy with Gass when it is clear that they were dealing in utter good faith."

The trial court stated further that, under the circumstances, it was incumbent upon Bowlin, as an officer and a director of the corporation, to inform the Lowerys that the lot was not for sale, if that was the case. The trial court observed that Bowlin's testimony indicated he was conscious of this obligation but "inadvertently or deliberately . . . failed to so inform the Lowerys . . . ."

The trial court also made important findings with respect to the handling of the internal affairs of the corporation. The court found that, except for organizational matters, there were no recorded meetings or resolutions of the stockholders or directors from the inception of the corporation until after the conveyance of the property in dispute. During this period, numerous loans were negotiated and another motel was purchased, with the corporation giving deeds of trust for the purchase price. In addition, two substantial bank loans were obtained; both were secured by deeds of trust granted in the corporation's name. All the documents in connection with these transactions were executed by Mr. and Mrs. Gass, as corporate president and secretary, respectively, without any authorization appearing in the corporation's minute book. Even the acquisition of the property involved in this case lacked recorded authority of the directors.

Lake does not question any of the trial court's factual findings. Instead, it rests its case for reversal upon the bald proposition that, in the absence of a formal resolution of the board of directors authorizing the sale to the Lowerys, the deed effectuating the sale is void. We considered a similar argument in *Moore* v. *Aetna Co.*, 155 Va. 556, 155 S.E. 707 (1930):

It is argued with apparent earnestness that in the absence of any express resolution by the board of directors, in formal meeting assembled and recorded in the minute book, [the corporate secretary] exceeded his authority under the by-laws, and a number of cases are cited as to the necessity of formal action in many cases requiring corporate action. It is perfectly well settled, however, that where there is a close corporation, such as this was, in which the stockholders of the corporation themselves ignore the by-laws and conduct its business differently, that rule does not apply.

*Id.* at 568, 155 S.E. at 711.

Certainly a corporation should act through its board of directors, and in accordance with the limitations imposed by its charter and by-laws; but when, with the knowledge and acquiescence of all of its stockholders, it declines so to do, it must accept the consequences. It cannot be permitted to accept all the benefits of such irregular contracts without assuming all of the resulting liabilities.[5]

155 Va. at 570, 155 S.E. at 711. We expressed similar views in *Brewer* v. *Bank of Danville*, 202 Va. 807, 812-13, 120 S.E.2d 273, 278 (1961), and *Coastal Pharmaceutical* v. *Goldman*, 213 Va. 831, 836-37, 195 S.E.2d 848, 852-53 (1973).

■ It is true that *Moore, Brewer,* and *Coastal* did not involve the sale of corporate real estate.[6] But the rule enunciated in those cases is designed to protect parties who deal in good faith with close corporations that conduct their internal affairs informally. Those in the Lowerys' position need the rule's protection just as much as the parties who were provided its security in *Moore, Brewer,* and *Coastal.* Accordingly, we hold that where, as in the present case, all the stockholders and directors of a close corpora-

---

[5] As noted *supra,* the proceeds of the sale of the lot in question were deposited in the motel's bank account and used to pay corporate expenses. We have been unable to find in the record an offer by Lake to refund to the Lowerys the purchase price of the lot or any other amount in return for a reconveyance.

[6] *Moore* involved an assignment of corporate property to protect the surety on a performance bond. *Brewer* concerned an agreement to pay a former corporate president a fixed sum per week for life. *Coastal* dealt with an agreement to merge two corporations by the sale of all the stock of one to the other.

tion agree to or acquiesce in a real estate transaction similar to the one involved here, the corporation is bound by the transaction.

For the reasons assigned, we will affirm the decree of the trial court upholding the validity of the deeds in question.

*Affirmed.*