## CIRCUIT COURT OF FAIRFAX COUNTY

Seniors Coalition, Inc., et al.

v.

Karl W. Lady et al.

### Case No. (Chancery) 135406

September 21, 1994

BY JUDGE JANE MARUM ROUSH

This matter came on to be heard on August 29, 1994, on the motion of Complainants to strike the appearance of Gibson, Dunn & Crutcher as counsel for The Seniors Coalition, Inc. The time allotted for the hearing expired and counsel submitted closing arguments in writing to the Court. I have now reviewed the pleadings, briefs and closing arguments of counsel. For the reasons stated below, the motion is denied.

On July 18, 1994, The Seniors Coalition, Inc., Warren D. Stewart, James G. Carlen and Kim R. Pearson (collectively, the "Complainants"), commenced this case by filing a Bill of Complaint for Injunctive Relief. The original defendants are Karl W. Lady, James G. Aldige, III, and George P. McDonnell. The Complainants moved to add Paul Bramell as a defendant and, although no order has been entered adding Mr. Bramell as a defendant, he stated at the August 29, 1994, hearing that he consented to being a defendant and participated in the hearing as a defendant. Mr. Bramell has since filed his answer to the bill of complaint. Therefore, all the original defendants and Mr. Bramell shall be referred to collectively as the "Defendants."

In essence, this case is a fight for control of the board of directors of The Seniors Coalition, Inc., a Virginia non-stock corporation. The Corporation is engaged in lobbying on behalf of senior citizens. The Corporation funds its lobbying efforts through direct mail solicitation of senior citizens.

The Complainants and the Defendants each claim to be or represent the "true" board of directors of the Corporation; each calls the other an "imposter" board. The lead complainant is Mr. Pearson, a lawyer who publishes a newsletter about the U.S. Food and Drug Administration. Mr. Pearson testified he was reading the *Fairfax Journal* newspaper on March 27, 1994, when he noticed an article that questioned the fund raising tactics of the Corporation. He decided to investigate the Corporation. He went to Richmond and examined the Corporation's corporate records at the State Corporation Commission. He noticed that the composition of the Corporation's board of directors had changed in the early 1990s. He contacted two of the former directors, complainants Stewart and Carlen. Messrs. Stewart and Carlen had not been active in the Corporation's affairs for several years. They told Mr. Pearson that, contrary to the annual reports filed with the S.C.C., they had never formally resigned or been replaced as directors of the Corporation. Mr. Pearson offered to help Messrs. Stewart and Carlen "reassert their authority" over the Corporation. On May 5, 1994, Messrs. Stewart and Carlen held a meeting of the board of directors and elected Mr. Pearson to the board. (At the August 29, 1994, hearing, this board was referred to as "Board B," and I will continue to use that appellation.)

None of the activities of Board B was known to the Defendants, who had been running the day to day operations of the Corporation since 1992, apparently unaware that there was any question but that the old board of directors had either resigned or been removed in accordance with the Corporation's bylaws. (The defendants Lady, Aldige and McDonnell will be referred to as "Board A.") The defendant Bramell was hired to be the chief executive officer of the Corporation in late 1992. Mr. Bramell testified that the Corporation was on the brink of bankruptcy when he joined it. He instituted the Corporation's direct mail fund raising, which has proven to be very successful. In the first seven months of 1994, the Corporation has raised over $7 million. Mr. Bramell testified that the first he knew of the recent activities of Board B was when the instant suit was filed and Board B persuaded the Corporation's bank to freeze the Corporation's operating accounts. Complainants noticed a hearing for July 19, 1994, on their motion for a preliminary injunction to prohibit Board A from acting

as the directors of the Corporation until it is determined which of the competing boards is the true board of directors of the Corporation. When the case was called on July 19, the parties advised the Court that they had reached an interim settlement: the hearing on the temporary injunction would be continued until August 19, 1994 (later continued again until October 19, 1994) and the parties entered into a "stand still" agreement (reflected in this Court's consent decree of July 27, 1994) which would allow the Corporation to continue its operations until the hearing on the preliminary injunction. The consent decree provided, among other things, that Mr. Pearson would have the right to review with Mr. Bramell the financial transactions of the Corporation and that "[a]ny disputes relating to such transactions, including checks to be issued by [the Corporation], shall be resolved by mutual agreement of the parties, and upon failure to reach such agreement, by the Court." Consent Decree, July 27, 1994, para. 4.

Subsequently, Mr. Bramell, as chief executive officer of the Corporation, became concerned with the Corporation's well-being while Board A and Board B litigated their dispute. With little advance notice to Board A or Board B and without the consent of Mr. Pearson, Mr. Bramell hired the law firm of Gibson, Dunn & Crutcher to represent the Corporation and paid the law firm a retainer of $100,000 of the Corporation's funds. Gibson, Dunn & Crutcher entered its appearance on behalf of the Corporation. It is that notice of appearance that the Complainants, who consist of Board B and the Corporation, moved to strike. (Gibson, Dunn & Crutcher has assured the Court that it is holding the retainer in its trust account and will not disburse it until permitted by further order of this Court.)

Board B argues that the appearance of Gibson, Dunn & Crutcher should be stricken because the firm was hired by Mr. Bramell without the mutual consent of Board A or Board B in contravention of the July 27, 1994, consent decree. Further, Board B argues, there is no need for the law firm to represent the Corporation in this case. Board B argues that its counsel can adequately represent the Corporation's interests. Mr. Bramell may need separate counsel, says Board B, but he should hire counsel with his own funds and seek indemnification from the Corporation should that be deemed appropriate after the resolution of the instant dispute. Alternatively, Board B asserts that the Corporation does not need representation in this case, that whichever board is determined to be the true board can represent the interests of the Corporation and that I should therefore exercise my authority under Rule 2:19 of the Rules of the Supreme Court of

Virginia to realign the parties in this case to be Board A, Board B and Mr. Bramell (in essence striking the appearance of the Corporation as a party in this case altogether).

Counsel for Board A did not actively participate in the August 29, 1994, hearing or submit a post-hearing closing argument. Mr. McDonnell, a member of Board A, testified that Board A consents to the Corporation's hiring of Gibson, Dunn & Crutcher.

Mr. Bramell and Gibson, Dunn & Crutcher argue that the Corporation does need separate representation in this case, apart from either Board A or Board B's counsel. According to Mr. Bramell, "a corporation and its chief executive officer, caught in the middle of a struggle for corporate control, are entitled to legal representation to protect their interests." Furthermore, Mr. Bramell contends, his hiring of the law firm was authorized by Board A and Board B and not prohibited by the July 27, 1994, consent decree. Mr. Bramell asks that I deny the motion to strike the appearance of Gibson, Dunn and Crutcher as counsel for the Corporation, strike the appearance of Board B's counsel as counsel for the Corporation, and exercise my authority to realign the parties to style the case as Board B as complainants versus Board A as respondents versus Mr. Bramell and the Corporation as intervenor/respondents.

I have carefully considered the pleadings in this case, the testimony at the August 29, 1994, hearing including the demeanor of the witnesses, and the post-hearing briefs of the parties. I was concerned at the conclusion of the hearing whether I had the authority to re-align the parties in this case. Both sides agree that I do have that authority, but disagree as to whether and how I should exercise that authority.

I have concluded that the Corporation should have representation independent of the counsel for either Board A or Board B. Under Virginia law, a corporation is a legal person, separate and distinct from its owners and directors. *Keepe v. Shell Oil Co.*, 220 Va. 587, 591, 260 S.E.2d 722 (1979); *Starring v. Kemp*, 167 Va. 429, 435, 188 S.E.2d 174 (1936). Furthermore, I conclude that the Corporation should be a party to this case, and not left on the sidelines while Board A and Board B litigate. The Corporation has a direct interest in whether Board A or Board B is the true board of directors of the Corporation and that interest cannot be adequately represented by either of the warring boards. The Corporation should be a party to this cause. *Bates v. Cekada*, 130 F.R.D. 52, 57 (E.D. Va. 1990), *citing Tower Hill Connellsville Coke Co. v. Piedmont Coal Co.*, 33 F.2d 703, 706 (4th Cir. 1929), *cert. denied*, 280 U.S. 607, 50 S. Ct. 157 (1929) (company

and its directors are necessary and indispensable parties if the court's decree seeks in any way to direct or control the company's management).

As chief executive officer of the corporation, Mr. Bramell had the authority to hire separate counsel for the Corporation under the Corporation's bylaws. I find that his hiring of Gibson, Dunn & Crutcher did not violate the consent decree of July 27, 1994, as both Mr. Bramell and Mr. Pearson testified that the "stand still" agreement contemplated that disputed payments could be brought to this Court for resolution before or after they were made.

At this point, I see no need for Mr. Bramell and the Corporation to be separately represented in this case. Mr. Bramell impressed me at the August 29, 1994, hearing as someone who had the best interests of the Corporation at heart. He appeared to me to be able to remain above the fray and to continue operating the day-to-day affairs of the Corporation despite the distraction of the ongoing fight for control of the board of directors. Of course, Gibson, Dunn & Crutcher must remain vigilant to its ethical responsibilities should the interests of Mr. Bramell and the Corporation later diverge as this litigation progresses.

The Complainants' Motion to Strike the Appearance of Gibson, Dunn & Crutcher is denied. Gibson, Dunn & Crutcher is permitted to represent both Mr. Bramell and the Corporation. The law firm may disperse the retainer it holds in accordance with the terms of its engagement by Mr. Bramell on behalf of the Corporation. The appearances of Bayh, Connaughton, Fensterheim & Malone, P.C., Duff & Leffler, and Keck, Mahin & Cate for The Seniors Coalition, Inc., are stricken. The parties to this case shall be realigned as follows: Messrs. Stewart, Carlen and Pearson ("Board B") are the Complainants; Messrs. Lady, Aldige and McDonnell ("Board A") are the Respondents, and The Seniors Coalition, Inc., and Mr. Bramell are the Intervenors/Respondents. (The caption of this case should be amended accordingly.) Leave is granted to Mr. Bramell and The Seniors Coalition, Inc., to file their pleadings as intervenors/respondents within ten days of the entry of an order reflecting this ruling.

December 22, 1994

BY JUDGE J. HOWE BROWN

This case came before the Court on October 19, 1994. On the basis of the evidence and the written briefs of counsel, the Court makes the following findings of fact and conclusions of law.

In 1979, Dan Alexander formed an organization called Taxpayers Education Lobby (hereinafter "TEL"). Over time, the activities of this organization expanded into senior adult issues, and he conducted activities in that regard under the name The Seniors Coalition, Inc. (hereinafter "TSC"). TSC, as a "division" of TEL, sent out a newsletter and conducted some minor fund raising and lobbying. In 1990, Alexander decided to separately incorporate Seniors Coalition. Alexander asked two old friends, Warren D. Stewart and James D. Carlen, and an employee of TEL, Hansen, to be on the Board of Directors of TSC. They accepted and the original Board of Directors was formed (hereinafter "Board A"). It was agreed in advance that Hansen would resign and be replaced after the corporation was up and running. Alexander told Stewart and Carlen that it would take some time for the corporation to get started, and he would tell them when to begin exercising their duties as the Board of Directors. Alexander kept TSC going as a division of TEL during this interim. Formal papers were prepared and filed, showing Board A as the initial Board of Directors. Board A never acted. Before Alexander communicated with Stewart and Carlen, members of the Board of Directors of TEL, Karl Lady, James Aldige, and George McDonnell, convinced Alexander that they should be the TSC Board of Directors. Alexander decided to make that change and to put Stewart and Carlen on the Board of TEL. Neither Alexander nor anyone else ever formalized that change. Hansen did formally resign as had been planned. At the time he resigned, Alexander told him that Stewart and Carlen had resigned, but the Court finds that they had not, and, indeed, Stewart and Carlen had no knowledge of the proposed changes.

In early 1992, the new Board of Directors of TSC, comprised of Lady, Aldige and McDonnell (hereinafter "Board B"), began to operate TSC in earnest. Alexander had originally formed TSC with $300.00. Board B built it into a corporation with significant assets and many activities. Over time, Board B squeezed Alexander out of control, after becoming concerned about the effect his past criminal convictions might have on the corporation. Interestingly, Alexander had no formal position with either TEL or TSC from 1987 forward. Despite this lack of a formal position, he ran the companies unimpeded until Board B edged him out of control. There was no need for formal meetings or other corporate formalities; what Alexander said was law. Alexander ran the corporations autocratically, rather than following established corporate procedures. After Board B took control, it

was treated in all respects, by Alexander and others, as if it was the lawfully constituted Board of Directors of TSC.

The issue presented in this case is which Board of Directors is the rightful Board and therefore entitled to assume the duties of the Board of Directors of The Seniors Coalition, Inc. Board A contends that Virginia statutes and the corporation's bylaws govern this case. It is true that corporations are creatures of statutory law. TSC was incorporated and Carlen, Stewart and Hansen elected as its Board of Directors in November, 1990. According to its bylaws, the current Board of Directors is to elect a new Board of Directors at each annual meeting. As the evidence demonstrates, during its tenure, Board A never had the annual meeting for elections as required by its bylaws and Va. Code Ann. § 13.1-855 (Michie 1950). Technically, Board A's term ended after its first year. Virginia law, however, provides that failure of a corporation to elect directors at its annual meeting for the election of directors, or failure to hold such a meeting, results in the directors then in office holding over until their successors are elected. *Blue Ridge Property Owners v. Miller*, 216 Va. 611, 613, 221 S.E.2d 163 (1976). The holding in *Blue Ridge*, however, was predicated on facts which presuppose that an election, although not held when scheduled or invalid for procedural defects, is imminent. In this case, the initial board failed to act for four years and then only surfaced to challenge the actions of another board, who had been discharging and fulfilling the fiduciary duties of the Board of Directors of the corporation.

Virginia statutes lay out the procedural mechanisms for a corporation's existence but do not demand strict adherence in all cases. The Supreme Court recognizes that "the total complex of corporate law acknowledges that all corporations are not alike and recognizes that strict statutory conformity, seldom practiced faithfully by the largest and most sophisticated corporations, is impractical if not impossible for others." *Coastal Pharmaceutical Co. v. Goldman*, 213 Va. 831, 836, 195 S.E.2d 848 (1973). The doctrine of permitting close corporations, especially non-stock corporations, to act informally is recognized as an exception to the general rule that directors must act as a board at duly convened meetings. *Fletcher Cyc. Corp.*, § 394.1; *Brewer v. First Nat. Bank of Danville*, 202 Va. 807, 120 S.E.2d 273 (1961).

The reality of this case is that from its inception, TSC did not faithfully follow the requirements of its own bylaws, nor those prescribed by Virginia statute. The corporation operated informally, as many non-stock close corporations do. Board A relied solely on the representations of

Alexander to inform them of their election and to dictate when they began fulfilling their duties as directors of the corporation. It never occurred to the individual members of Board A that they were in charge of the corporation and had corresponding duties. Rather, it was Alexander who was in charge of the corporation's existence.

Both Board A and Board B singularly relied on the representations of Alexander as to the composition of the corporation. While Board A may have been the hold-over board of directors following its failure to hold the annual meeting to elect the board of directors, Board B subsequently was designated in the same informal manner that Board A was originally selected: through the representations of Alexander. "While it is salutary, and in some instances mandatory, that these rules be followed, it is generally recognized that where there is a family, or close corporation, such as the one involved in this case, in which the stockholders, officers, and directors ignore the requirements of the statutes and bylaws and conduct its business in an informal manner, the actions so taken may, nonetheless, be binding upon the corporation." *Brewer v. First Nat. Bank of Danville*, 202 Va. 807, 812-13, 120 S.E.2d 273 (1961).

From the inception of the corporation, Board A conferred sweeping powers and authority upon Alexander as their agent. Both Board A and Board B consented to the agency relationship that existed between themselves and Alexander, until Alexander was ousted from power by Board B. The members of Board B, Hansen, the corporation's outside attorney, and Fay Alexander, who handled all corporate documents, all believed that the boards had been switched and that Board B was now the rightful Board of the corporation. Board B was listed on all tax returns and documents filed with the SCC as the Board of Directors of TSC. This demonstrates that all parties involved believed in the legitimacy and binding effect of its informal actions. In the two years that Board B was performing as the Board of Directors of the corporation, Board A never challenged Board B's claim because they were still waiting to hear from Alexander. It was unnecessary for the members of Board A to resign. Their tenure had expired, and without reelecting themselves, they were acting only as the holdover board. Following the instituted practice of informal action, Alexander, acting in his agency capacity, had Board B replace Board A as the new Board of Directors.

Board A argues that without their formal resignations and the formal election of Board B, Board B's existence as the Board of Directors of TSC is de facto and, consequently, null and void. The Supreme Court consid-

ered a similar argument in *Moore v. Aetna Co.*, 155 Va. 556, 155 S.E. 707 (1930):

> It is argued with apparent earnestness that in the absence of any express resolution by the board of directors, in formal meeting assembled and recorded in the minute book, [the corporate secretary] exceeded his authority under the bylaws, and a number of cases are cited as to the necessity of formal action in many cases requiring corporate action. It is perfectly well settled, however, that where there is a close corporation, such as this was, in which the stockholders of the corporation themselves ignore the bylaws and conduct its business differently, that rule does not apply.

*Id.* at 568. Both Boards, the agent, Alexander, the corporate secretary and the corporate attorney of TSC all ignored corporate formalities imposed by its own bylaws and Virginia statute. TSC is therefore bound by its own informal course of conduct.

Recently, the Supreme Court reaffirmed the close corporation doctrine by stating that "we repeatedly have refused to invalidate acts of closely held corporations simply because certain corporate formalities were not observed." *Curley v. Dahlgren Chrysler-Plymouth-Dodge*, 245 Va. 429, 433, 429 S.E.2d 221 (1993). When Board A allowed Alexander to carry on the corporation's affairs during their entire tenure, it acquiesced to his serving as the board's agent. If a board declines to follow the limitations and formalities of its bylaws, it must accept the consequences. Because Board A allowed Alexander to represent its interests and carry out its duties, it must accept that he elected Board B in their stead. The Supreme Court has consistently held that a corporation cannot escape liability for commercial commitments made by its officers in the name of the corporation by asserting a lack of de jure authorization by its board of directors. *Holstein Co. v. H. Kirk Sons*, 150 Va. 82, 142 S.E. 373 (1928). Likewise, a board of directors of a close corporation that failed to act, failed to follow formal action, and acknowledged the authority of an agent to act on its behalf cannot now come forward to repudiate the acts of that agent, claiming that corporate formalities were not followed.

This court finds that Board A became the holdover board in December, 1991, after they failed to hold the annual election to elect the corporation's board of directors. Their course of conduct demonstrates that they vested all authority in Alexander as their agent. Alexander, in his capacity as

agent, supplanted Board B as the Board of Directors of the corporation. "If implied or de facto authorization is sufficient to bind the corporation and its stockholders to obligations, it is sufficient to validate their rights." *Coastal Pharmaceutical Co. v. Goldman*, 213 Va. 831, 836, 195 S.E.2d 848 (1973). The lack of requisite compliance with the formalities does not invalidate Board B's presence as the legitimate board of directors. As the Supreme Court acknowledged in *Coastal Pharmaceutical Co. v. Goldman*, 213 Va. 831, 836, 195 S.E.2d 848 (1973), "[i]n this case, the agreement . . . was not authorized at a formal meeting of the board of directors of the corporation, nor was the writing executed in the proper manner. However, it was clear from the actions of the parties, from the circumstances surrounding and subsequent to the execution of the agreement . . . that it was intended, by all concerned, to be the act of the corporation." The court finds as a matter of law that Board B is the lawful Board of Directors of TSC.

As further authority for its holding that Board B is the rightful Board of Directors of TSC, this court also looks to Va. Code Ann. § 13.1-861 (Michie 1950) which states that a "court shall proceed in a summary way to hear and decide the issues and thereupon to determine the person elected or order a new election or grant such other relief as may be *equitable*" (emphasis added). It is clear that equitable principles dictate the above resolution in this case. This is because equity treats that as done which ought to be done. *Marcy v. Graham*, 142 Va. 285, 128 S.E. 550 (1925). It was the intention of Alexander and all active members of the corporation to switch the boards and have Board B serve as the acting board of directors of the corporation. All parties have carried on as if this switch and election took place. Board B has taken a corporation that was in the throes of financial debilitation and catapulted it to the level of a thriving corporation. Board B should be allowed to reap the benefits of its hard work.

During the entire two-year period that Board B was rebuilding the corporation, Board A never came forward to challenge Board B's status as the Board of Directors of the corporation. Equitable principles demand that a complainant must be diligent in his efforts to pursue his rights, for "equity aids only the vigilant." *Pucket v. Jessee*, 195 Va. 919, 930, 81 S.E.2d 425 (1954). Moreover, a court of equity "has always refused to give its aid to stale demands where the party has slept upon his rights and acquiesced in adverse use thereof to the prejudice of another for a great length of time." *Id.* Whenever the delay has been so great as to "induce other persons to

alter their circumstances or conduct so that the element of estoppel is introduced, a court of equity will commonly hold the delay to operate as an absolute bar." *Camp Manufacturing Co. v. Green*, 129 Va. 360, 106 S.E. 394 (1921). Again, it has been shown that between 1992 and 1994 when this suit was instituted, Board B completely ran the corporation. At no point during this two year stint, nor anytime prior, did Board A ever come forward to assert itself as the rightful board of directors and accept the enormous liabilities and responsibilities that accompany this stewardship. Board A's delay in coming forward totally altered the corporation and Board B's course of conduct, and to align the parties otherwise would work a great injustice.

In cases arising under Va. Code Ann. § 13.1-851 (Michie 1950), the chancellor is given "a free hand to enable them to 'make such order or give such relief in the premises as right and justice may require.' They may and ought to be governed by equitable principles . . . ." *Pierce Oil Corp. v. Voran*, 136 Va. 416, 428, 118 S.E. 247 (1923) (proceeding under prior version of the statute in Va. Code Ann. § 3803 and § 3804 (1919)). This court, therefore, finds that Board B is the lawful board of directors of the corporation.