Present: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Agee, JJ., and Carrico, S.J.

WBM, LLC

OPINION BY
v. Record No. 041990   SENIOR JUSTICE HARRY L. CARRICO
June 9, 2005

WILDWOODS HOLDING CORPORATION

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Thomas S. Shadrick, Judge

This is an appeal in a chancery proceeding brought by WBM, LLC seeking to require Wildwoods Holding Corporation specifically to perform a contract for the sale of 23 unimproved lots in the City of Virginia Beach. The chancellor struck WBM's evidence and, in a final decree, denied specific performance. WBM appeals. Finding no error in the decree, we will affirm.

Wildwoods was chartered by the State Corporation Commission on November 17, 1971. Its articles of incorporation authorized it, inter alia, "to deal generally in real estate of all kinds and descriptions" and "[t]o sell, exchange or otherwise dispose of all or any part of the property, assets, good will, leases and business of the corporation."

William Gerald Chaplain (Jerry) is president and a director of Wildwoods and the owner of 50% of its stock. Jerry's sister, Susan Chaplain Goldsticker Lagara (Susan), is a director owning 25% of the stock, and another sister,

Anne K. Chaplain (Kay), is a director and an owner of the remaining 25% of the stock.

Wildwoods has owned the 23 lots in question since its incorporation in 1971 and has not, previous to the contract in question, contracted to sell any of the lots nor has it owned and sold any other real property. The lots represent the sole assets of the corporation.

In the "30-some years" of its existence, Wildwoods has held only three formal meetings of its board of directors. One such meeting was the organizational meeting in 1972, the second was on June 23, 2002, to approve a lease, and the third was on June 25, 2002, to document the resignation of a former president and the election of Jerry as president in his place. There was no corporate meeting or corporate resolution concerning the contract in issue here.

That contract lists Wildwoods as "Seller" and Edward A. Chaplain (Eddie) as "buyer." Eddie is Jerry's nephew and Susan's son. The contract bears the date of December 18, 2003, and calls for a purchase price of $300,000.00 for 23 lots described in an exhibit attached to the contract.[1]

_____

[1] Eddie testified at trial that he mistakenly entered December 18, 2003, as the date of the contract when it should have been December 18, 2002. He testified further that the contract also mistakenly required a $500,000.00 rather than a $500.00 deposit against the $300,000.00 purchase price.

The contract bears the signatures of "Edward A. Chaplain" and "William G. Chaplain Pres."

Eddie planned to join these 23 lots with several other parcels to form a single tract of land in the development of a residential real estate project. After Eddie obtained the contract on the 23 lots, he proceeded to close on the purchase of the other parcels. Eddie testified, however, that Jerry later said he had "changed his mind and didn't want to sell" the 23 lots.

Eddie then assigned the contract on the 23 lots to John and Steven Bishard and joined with them in forming WBM to develop the property. The Bishards in turn assigned the contract to WBM, and this suit for specific performance soon followed.

In its answer to WBM's bill of complaint for specific performance, Wildwoods denied that Jerry had executed the contract in question. At trial, WBM called Jerry as an adverse witness. He was asked if he was "still denying that [he] signed the contract." He replied, "[a]bsolutely positively over my dead father's grave." He also testified he "never saw that contract until it was sent to [him with] the lawsuit." However, his sister, Susan, testified that the signature on the contract was Jerry's and a handwriting expert testified to the same effect.

3

With respect to Jerry's signature on the contract, WBM in its first assignment of error invokes Code § 8.01-279. This Code section provides that "when any pleading alleges that any person made, endorsed, assigned, or accepted any writing, no proof of the handwriting shall be required, unless it be denied by an affidavit accompanying the plea putting it in issue." Code § 8.01-279(A).

As noted previously, Wildwoods' answer to WBM's bill of complaint put Jerry's signature on the contract in issue. However, the answer was neither sworn to nor accompanied by an affidavit denying the handwriting. When WBM called the lack of an affidavit to the attention of the chancellor, he ruled that, because Jerry's purported signature on the contract had "been the issue all through discovery," an affidavit was unnecessary and that Wildwoods would be allowed to deny the signature at trial.

This was error, but it was harmless error in this case. The chancellor did not deny WBM specific performance on the ground Jerry had not signed the contract. Indeed, while denying specific performance, the chancellor stated in the final decree that "the contract may be valid to permit a damage judgment for breach," a statement the

4

chancellor would not have made had he believed Jerry did not sign the contract.[2]

Rather, the chancellor denied specific performance on entirely different grounds. With respect to one of those grounds, the chancellor held that Jerry was without authority to execute the contract because Wildwoods' board of directors did not submit the contract to the shareholders and the shareholders entitled to vote did not approve the contract. This holding is the subject of several of WBM's assignments of error.

Two Code sections are pertinent. Section 13.1-723(A) provides that a corporation "may, under the terms and conditions and for the consideration determined by the board of directors . . . [s]ell, lease, exchange, or otherwise dispose of all, or substantially all, of its property in the usual and regular course of business."

Code § 13.1-724(A) provides that a corporation "may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property, otherwise than in the usual and regular course of business, on the terms and conditions and for the consideration determined by the corporation's board of directors, if the board of directors adopts and its shareholders approve the proposed transaction." Under subsection (B)(1), for a transaction

---

[2] The issue of damages was not before the chancellor.

5

to be authorized, the board of directors must submit "the proposed transaction to the shareholders."  Under subsection (B)(2), the "shareholders entitled to vote shall approve the transaction," and, under subsection (E), the transaction "shall be approved by the holders of more than two-thirds of all the votes entitled to be cast on the transaction."[3]

WBM contends that, since Wildwoods was organized for the purpose of buying and selling property, the sale to Eddie was "in the usual and regular course of [Wildwoods'] business."  Thus, WBM says, the sale could be made pursuant to Code § 13.1-723 "on the terms and conditions and for the consideration determined by the board of directors" without the formalities required by Code § 13.1-724.

However, all the property Wildwoods has ever owned consists of the 23 lots in question, and, as the chancellor noted, Wildwoods "has been in business for thirty years and has never sold anything."  The conclusion is inescapable, therefore, that Wildwoods was not in the business of buying and selling real estate within the meaning of Code § 13.1-723.  "[T]he fact that [a] corporation was chartered for

_____

[3] WBM does not mention Code §§ 13.1-723 and -724 but cites Code §§ 13.1-899 and -900.  These latter sections deal with nonstock corporations but their provisions parallel those in §§ 13.1-723 and -724.  Since Wildwoods is a stock corporation, we will use §§ 13.1-723 and -724 in our analysis of the situation.

these purposes is, of course, no evidence that it actually engaged in such business." Mosell Realty Corp. v. Schofield, 183 Va. 782, 791 n.2, 33 S.E.2d 774, 778 n.2 (1945).

WBM argues, however, that "[i]n any event, the sale is specifically enforceable regardless of whether Jerry received formal authorization, by resolution or otherwise." WBM opines that when a closely held corporation clothes its president with apparent authority to enter into a contract on its behalf and acquiesces in the exercise of that authority, the corporation is bound by the contract. Here, WBM says, "Jerry represented himself to Eddie as the President of Wildwoods and as having the authority to enter into the contract on the corporation's behalf for the sale of the subject property" and "the corporation's board of directors permitted Jerry to make such a representation through its acquiescence."

We disagree with WBM. "It is elementary that the authority of the directors is conferred upon them as a board, and they can bind the corporation only by acting together as an official body. A majority of them, in their individual names, cannot act for the board itself and bind the corporation." Mosell, 183 Va. at 793, 33 S.E.2d at 778-79.

Here, the directors did not act together as an official body with respect to the contract for the sale of Wildwoods' land. So far as the record discloses, Jerry acted alone without consulting the other directors. While Susan testified that the signature on the contract was Jerry's, she did not say that he had consulted her about the transaction, that he had authority to sign the contract, or that she approved the particular sale involved in the contract, despite the fact that the sale was to her son.

The other director, Kay, did not testify, and there is no evidence she even knew of the existence of the contract. Jerry did not mention Kay in his testimony, and Susan testified that while she "still talk[ed] to [her] brother Jerry," she did not "talk to [her] sister Kay."

While it might be argued that Susan acquiesced in the sale by failing to object to it, the same may not be said about Kay. Acquiescence is "[a] person's tacit or passive acceptance; implied consent to an act." Black's Law Dictionary 25 (8th ed. 2004). But, "[b]y definition, acquiescence presupposes knowledge." Virginia Elec. & Power Co. vs. Kremposky, 227 Va. 265, 271, 315 S.E.2d 231, 234 (1984). There can be no acquiescence "by [a person] in something he knew nothing about" and, therefore, where knowledge is lacking, "the elements of implied permission

are [also] lacking." Aetna Cas. & Sur. Co. v. Czoka, 200 Va. 385, 394, 105 S.E.2d 869, 876 (1958).

Furthermore, while WBM cites several decisions of this Court relating to closely held corporations, none approved the sale of corporate real estate representing the company's sole asset other than in the usual course of business. In fact, of fourteen cases WBM cites, only three involved the sale or conveyance of real estate: Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 413 S.E.2d 599 (1992); Lake Motel, Inc. v. Lowery, 224 Va. 553, 299 S.E.2d 496 (1983); Sterling v. Trust Co. of Norfolk, 149 Va. 867, 141 S.E. 856 (1928).

Our decision in Lake Motel is inapposite. There, this Court upheld a contract for the sale of corporate real estate signed only by the corporation's president and a deed signed by the president as well as the corporate secretary. 224 Va. at 556, 299 S.E.2d at 497. However, unlike the present case, "all the stockholders and directors . . . agree[d] to or acquiesce[d] in [the] real estate transaction," id. at 560-61, 299 S.E.2d at 500, and the sale concerned "only a minor holding, one not even used in the corporation's business," id. at 558, 299 S.E.2d at 499.

Our decisions in Sterling and Princess Anne actually support Wildwoods' position, not WBM's. In Sterling, the

9

secretary-treasurer, who was also the general manager of a closely held corporation, signed a contract for the purchase of a parcel of land for the company's expansion. 149 Va. at 872-73, 141 S.E. at 857.  This Court approved the holding of the trial court that the secretary-treasurer/general manager lacked authority to bind the corporation to the contract.  We said the purchase of the parcel of land was "a matter of policy and planning the business of the corporation, which in law depended solely for its determination upon the discretion and judgment of its board of directors."  Id. at 881, 141 S.E. at 860.

In Princess Anne, this Court reversed the trial court's judgment holding valid a deed signed by the president of a civic league, a nonstock corporation.  We said that the president had no authority to execute the deed on behalf of the civic league without satisfying the formal requirements of former Code § 13.1-246 (now Code § 13.1-900), i.e., the adoption of a resolution by the board of directors recommending the transaction and directing that the matter be submitted to a vote at a membership meeting.  243 Va. at 61, 413 S.E.2d at 604.

Not cited by WBM but directly on point is Mosell, supra, which involved a closely held corporation whose stock was owned in equal shares by the corporation's president, Sol Kaplan, its vice-president, L. H. Goldman,

and its secretary-treasurer, Leon Banks. 183 Va. at 787, 33 S.E.2d at 776. Kaplan, with Banks' acquiescence, authorized a real estate agent to sell the only property the corporation owned, which was essential to its continued operation. When the agent produced a purchaser and the proposed sale was presented to Goldman, he expressed his unwillingness to sell and repudiated the transaction. As a result, the sale was not consummated. Id. at 788-89, 33 S.E.2d at 776.

The agent secured a judgment against the corporation for a commission on the aborted sale. Id. at 786, 33 S.E.2d at 775. We reversed that judgment. What we said in Mosell applies with equal force here: "By virtue of his office alone, no executive officer or agent of a corporation has any authority to sell or make a contract for the sale of the real estate of the corporation. Thus, the secretary has no such power, nor has the president." Id. at 790, 33 S.E.2d at 777 (internal quotation marks and citations omitted). "Nor did the fact that Kaplan and Banks own two-thirds of the capital stock of the corporation, in the absence of statute, vest in them the authority to bind the corporation outside of a formal stockholders' meeting." Id. at 793, 33 S.E.2d at 779.

We also said that any apparent authority with which the president might have been clothed did not include the

power to enter into the contract to sell the corporation's land.  Id. at 790-91, 33 S.E.2d at 777-78.  WBM argues, however, that Wildwoods is estopped to assert Jerry's lack of authority in his capacity as president.  But WBM did not raise the issue of estoppel before the chancellor and has not made the issue the subject of an assignment of error here.  Accordingly, we will not consider the issue.  Rules 5:25 and 5:17(c).

Finally, WBM takes the chancellor to task for refusing specific performance after finding that "the contract may be valid to permit a damage judgment for breach."  But the chancellor did not say the contract was valid, only that it may be valid.  And he said that the case "was just brought before the Court for specific performance of this contract" and that "the Court is not making any binding determination as to the enforceability of the contract on a contract basis in a suit for monetary damages or whatever."

Generally, "[s]pecific performance of a contract does not lie as a matter of right, but rests in the discretion of the chancellor, and may be granted or refused under established equitable principles and the facts of a particular case."  Chesapeake Builders, Inc. v. Lee, 254 Va. 294, 300, 492 S.E.2d 141, 145 (1997).  Here, in addition to finding that Jerry lacked authority to sign the contract, the chancellor held that the terms of the

contract were "unclear, uncertain, incomplete and not definite enough to permit the Court to decree the extraordinary remedy of Specific Performance." As indicated <u>supra</u> at n.1, the date of the contract and the amount of the earnest money deposit were unclear and uncertain. The contract was also incomplete in that a blank space provided for the name of the person or entity to hold the deposit was not filled in.

Upon consideration of established equitable principles and the facts of this particular case, we cannot find that the chancellor abused his discretion in denying specific performance. Accordingly, we will affirm the chancellor's decree.

<u>Affirmed</u>.